## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUOOD ALMERDAEI, ALI ALAWI ALMARDAEI, AMR ALDAYLAM, SAMAN AL-GAAD, ABDO ALI SALEH, ALI ABDO SALEH, ALFIAH ABOD AHMED, JAMAL ALMANSOURI, NABILA ALHANASH, ARWA SALEH, FAISAL ALGUDARI, TAWFIK RAJEH, A.R., SIHAM RAJEH, ATEF RAJEH, WADLAH MOHAMMED SALEH, H.W.M.Q., H.W.M.Q. (2), N.W.M.Q., ABDLARZAK MOHSIN, BAHIA MOHAMMED AHMED YAHYA, AMIN EL BURATI, KUBLA MOSHIN, MAR ABDO KAID (a.k.a. FAIZ ALI AL-NOMAIR), SAQR AL-NOMAIR, HILAL AL-NOMAIR, EMTETHAL AL-NOMAIR, NORH A. AHMED, HUSSEIN ALI YAFAI, SHATHIA ABDO ALNAGGAR, NAKHLA SALEH HUSSEIN SAIBAAN, AHLAM HAUTER, ABDULRAKIB ABASHAAR, RASAM OBAID SAEED, EMAD NASR ABDULRAB NAGI, MANSOUR MOHAMED, GHAITHAH SHAROH, MAJDY ALHARBI, ANHAR ABDULLAH TAHER, ABDELBASET ALI, JAMILAH ALI, ESMAYL ALGAZALI, LATIFIYA ALGAZALI, FAYZAH ABDULLAH, GHYATH ABSULRAHMAN SALEH, The Estate of MOHAMED MUTAHER KASSEM, WAFE ABDULLA SALEH, NADA ALGHAITHY, B.H.A., G.H.A., S.H.A., SAEED SHARIF, SABA AL HAMRI, F.S., TAWFIK AL-SAIDI, ETIDAL ALKUAIF, MOHAMED AL-WAJIH, KAWKAB AL MALKI, ABDURAHMAN AL MALKI, ASSMA ADELHAMEED AL-QUHAIF, MOHAMED TAHER ALDAFRI, AMAL AL-OKAM., A.A., S.A., MUTEI AL GHAZALI, M.M.N.A., ABDASALAM SAEED, GEAB SAEED, MONA ABASS ZABARA, WALED MOHAMMED AL NEHMI, NAIF AL NAJAR, SOMAYAH AL NAJAR, M.A., DIANA AREVALO, YAHA AMER ALHAGAG, ABDO AHMED NASSER, GHAMDAM NASSER, MOKHTAR NASSER, HANAN FAHMI ALGHAITHI, WAZEA ABDULKADER ALGARADI, NEHMAH AHMED SHOHATEE, MUSTAFA AHMED YAHYA, SURIAH MOHAMED MUTHANA, MOHAMED QASEM, SAMERAH AHMED MUSA, ABDULLAH ALI SALEH, MEETHAK ABDULLAH ALI SALEH, AHMED YAHYA HAIMED, and QUBLAH TAHAR YAHYA<br><br>Plaintiffs,<br><br>v. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT** |

| |
|---|
| DONALD J. TRUMP, as President of the United States of )
America; STEPHEN MILLER, Senior Policy Advisor to the )
President of the United States of America; MATTHEW )
WHITAKER, Acting Attorney General of the United States; )
MICHAEL POMPEO, Secretary of State; U.S. )
DEPARTMENT OF STATE; U.S. DEPARTMENT OF )
JUSTICE; KIRSTJEN NIELSEN, Secretary of Homeland )
Security; U.S DEPARTMENT OF HOMELAND SECURITY; )
LEE FRANCIS CISSNA, Director of U.S. Citizenship and )
Immigration Services; U.S. CITIZENSHIP AND )
IMMIGRATION SERVICES; KEVIN K. MCALEENAN, )
Commissioner of U.S. Customs and Border Protection; U.S. )
CUSTOMS AND BORDER PROTECTION; DANIEL )
COATS, Director of National Intelligence; OFFICE OF THE )
DIRECTOR OF NATIONAL INTELLIGENCE; LARRY )
EDWARD ANDRE, JR., Ambassador to Djibouti; DEVIN )
KENNINGTON, Consular Officer at U.S. Embassy in )
Djibouti; CHAPMAN GODBEY, Consular Officer; RYAN )
NOLAN, Consular Officer at U.S. Embassy in Djibouti; U.S. )
EMBASSY IN DJIBOUTI, )
 )
     Defendants. )

## **INTRODUCTION**

1.  Plaintiffs in this action are U.S. citizens, lawful permanent residents ("LPRs"), and Yemeni visa applicants who are suffering a range of ongoing harms because of Defendants' failure to issue guidance and issue waivers under Presidential Proclamation 9645 ("the Proclamation").

2.  Plaintiffs are separated from their families and loved ones at critical times in their lives including pregnancy, marriage, childbirth, and medical need, are forced to live in desperate or dangerous circumstances, and are suffering severe emotional and financial harms.

3.  Each of their circumstances fit squarely within one or more of the examples offered in the Proclamation as a situation where a waiver grant may be appropriate.

4.      Plaintiffs seek the bare minimum an agency is expected to provide when it holds itself out as making a waiver available: clear guidance about the process; an opportunity to apply in an orderly manner; and full and timely adjudication of their requests.

5.      Plaintiffs do not challenge the Proclamation itself.  Instead, taking the Proclamation as the law of the land, Plaintiffs challenge Defendants' implementation of its waiver provisions.

6.      Plaintiffs allege that Defendants have failed to abide by the terms of the Proclamation, the Immigration and Nationality Act ("INA"), and its implementing regulations and guidelines by failing to provide appropriate guidance and an orderly application process for individuals to seek the grant of a waiver.

7.      Plaintiffs challenge the arbitrary and capricious nature of the limited agency guidance for adjudicating waivers, its insufficiency, and its inconsistency with both the text of the Proclamation and applicable provisions of the INA, implementing regulations, the Administrative Procedures Act ("APA"), and the Foreign Affairs Manual ("FAM").

8.      Plaintiffs also challenge the unreasonable denial and delay in adjudicating their immigrant visa applications although all of the Plaintiffs have clearly demonstrated that they qualify for waivers under the Proclamation.  Plaintiffs have shown that they have been separated from their families and loved ones, they have faced extreme financial hardship, their homes and hometowns have been destroyed by the war in Yemen, and they are suffering medical emergencies including life threatening tumors, cancer, gastrointestinal issues, difficulty breathing, and physical disabilities.

9.      As set forth below, Defendants' actions and inactions in implementing the waiver provisions of the Proclamation violate Plaintiffs' statutory and constitutional rights and are subject to review.

## JURISDICTION AND VENUE

10.     Jurisdiction is proper under 28 U.S.C. § 1331 (federal question statute), 28 U.S.C. § 1361 (Mandamus and Venue Act of 1962), 5 U.S.C. § 702 (APA), and 28 U.S.C. § 1346(a)(2) (United States as a defendant).  The United States has waived sovereign immunity pursuant to 5 U.S.C. § 702.  This Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. § 702, 28 U.S.C. § 1651, and 28 U.S.C. § 2201-2202.  A claim for attorney's fees will be brought pursuant to 5 U.S.C. § 504 and 28 U.S.C. § 2412(d).

11.     Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(e) because Defendants are officers or employees of the United States acting in their official capacities and agencies of the United States, many Plaintiffs reside in this judicial district, and no real property is involved in this action.  Plaintiffs have exhausted all administrative remedies.

## PARTIES

12.     Plaintiff-Petitioners Suood Almerdaei, Amr Aldaylam, Abdo Ali Saleh, Jamal Almansouri, Arwa Saleh, Tawfik Rajeh, Wadlah Mohammed Saleh,  Abdlarzak Mohsin, Amin El Burati, Mar Abdo Kaid (a.k.a. Faiz Ali Al-Nomair), Norh A. Ahmed, Shathia Abdo Alnaggar, Ahlam Hauter, Rasam Obaid Saeed, Mansour Mohamed, Majdy Alharbi, Abdelbaset Ali, Esmayl Algazali, Fayzah Abdullah, the Estate of Mohamed Mutaher Kassem, Nada Alghaithy, Saeed Sharif, Tawfik Al-Saidi, Mohamed Al-Wajih, Mohamed Taher Aldafri, Mutei Al Ghazali, Abdasalam Saeed, Mona Abass Zabara, Naif Al Najar, Diana Arevalo, Abdo Ahmed Nasser, Hanan Fahmi Alghaithi, Nehmah Ahmed Shihatee, Suriah Mohamed Muthana, Abdulla Ali Saleh, and Ahmed Yahya Haimed are United States citizens and/or LPRs who each filed a Form I-130, Petition for Alien Relative on behalf of their qualifying relative.

4

13.     Plaintiff-Beneficiaries Samah Al-Gaad, Ali Abdo Saleh, Alfiah Abod, Ahmed, Nabila Alhanash, Kubla Moshin, Emad Nasr Abdulrab Nagi, Anhar Abdullah Taher, Latifiya Algazali, Wafa Abdulla Saleh, B.H.A., G.H.A., S.H.A., Amal Al-Okam, M.M.N.A., Ghamdam Nasser, and Mokhtar Nasser each filed Form I-130 Petitions which were all processed by the National Visa Center ("NVC"), approved, and subsequently interviewed by Embassy officials.  After subjecting Plaintiff-Beneficiaries to months, and even years of delay, Defendants have refused to issue Plaintiff-Beneficiaries' previously approved visas, although according to the Proclamation, all Plaintiff-Beneficiaries and their families meet the requirements for a waiver.

14.     Plaintiff-Beneficiaries Ali Alawi Almardaei,  A.R., Siham Rajeh, Atef Rajeh, H.W.M.Q., H.W.M.Q. (2), N.W.M.Q., Bahia Mohammed Ahmed Yahya, Saqr Al-Nomair, Hilal Al-Nomair, Emtethal Al-Nomair, Hussein Ali Yafai, Nakhla Saleh Hussein Saibaan, Abdulrakib Abashaar, Ghaithah Sharoh, Saba Al Hamri, F.S., Etidal Alkuaif, Kawkab Al Malki, Abdurahman Al Malki, Assma Adelhameed Al-Quhaif, A.A., S.A., Waled Mohammed Al Nehmi, Somayah Al Najar, M.A., Wazea Abdulkader Algaradi, Mustafa Ahmed Yahya, Mohamed Qasem, Samerah Ahmed Musa, Meethak Abdullah Ali Saleh, and Qublah Tahar Yahya were each provided an immigrant visa interview following I-130 Form Petition approvals and were subsequently denied immigrant visas due to the Proclamation or have been awaiting processing on their immigrant visas.

15.     Plaintiff-Beneficiaries Faisal Algudari, Jamilah Ali, Gaeb Saeed, and Yaha Amer Alhagag have all received Form I-130 Petition approval notices and are currently awaiting immigrant visa interviews with Embassy officials.

16.     All Plaintiffs have an emergency and/or urgent circumstance and accordingly are eligible for a waiver under the Proclamation due to their emergency situation including the need for urgent

medical care, the need to be with their families after being separated for years, extreme financial hardship, and destruction of their hometown in war-torn Yemen.

17.     Defendant DONALD J. TRUMP is the President of the United States and is sued in his official capacity.  President Trump issued the Proclamation challenged in this suit.

18.     Defendant STEPHEN MILLER is the Senior Policy Advisor to the President of the United States and is sued in his individual capacity as well as his official capacity.  Stephen Miller is a key political advisor to President Donald Trump.  Stephen Miller played a significant role in the drafting of President Trump's Presidential Proclamation.  Stephen Miller has been a staunch advocate of restricting the entry and migration of Muslims in the United States.

19.     Defendant MATTHEW WHITAKER is the Acting Attorney General of the United States and is sued in his individual capacity as well as his official capacity.  Acting Attorney General Whitaker is responsible for overseeing the activities of the Department of Justice ("DOJ") with respect to the implementation and enforcement of the Proclamation.

20.     Defendant MICHAEL POMPEO is the Secretary of State and is sued in his individual capacity as well as his official capacity.  Secretary Pompeo is responsible for overseeing enforcement and implementation of the Proclamation by all U.S. Department of State staff.

21.     Defendant U.S. DEPARTMENT OF STATE is a cabinet-level department of the U.S. federal government responsible for the issuance of immigrant and nonimmigrant visas abroad. The Presidential Proclamation assigns the State Department a variety of responsibilities regarding its implementation and enforcement.

22.     Defendant DOJ is a cabinet-level department of the U.S. federal government.  The Proclamation assigns DOJ a variety of responsibilities regarding its implementation and enforcement.

23.     Defendant KIRSTJEN NIELSEN is the Secretary of Homeland Security and is sued in her individual capacity as well as her official capacity.  Secretary Nielsen is responsible for administration of the INA by the U.S. Department of Homeland Security ("DHS") and for overseeing enforcement and implementation of the Proclamation by all DHS staff.

24.     Defendant DHS is a cabinet-level department of the U.S. federal government.  Its components include U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").  USCIS's responsibilities include adjudicating requests for immigration benefits for individuals located within the United States.  CBP's responsibilities include inspecting and admitting immigrants and nonimmigrants arriving with U.S. visas at international points of entry, including airports and land borders.  ICE's responsibilities include enforcing federal immigration law within the interior of the United States.  The Proclamation assigns DHS a variety of responsibilities regarding its enforcement.

25.     Defendant LEE FRANCIS CISSNA is the Director of USCIS and is sued in his individual capacity as well as his official capacity.  Director Cissna is responsible for USCIS's implementation of the INA and its enforcement of the Proclamation.

26.     Defendant USCIS is an administrative agency within DHS, headquartered in Washington, DC.  USCIS oversees unlawful immigration to the United States, including the approval of visa petitions.  USCIS is assigned several responsibilities regarding implementation and enforcement of the Proclamation.

27.     Defendant KEVIN K. MCALEENAN is the Commissioner of U.S Customs and Border Protection ("CBP") and is sued in his individual capacity as well as his official capacity.

Commissioner McAleenan is responsible for CBP's implementation of the INA and its implementation and enforcement of the Proclamation.

28.     Defendant CBP is an administrative agency within DHS, headquartered in Washington, DC.  CBP is assigned several responsibilities regarding implementation and enforcement of the Proclamation.

29.     Defendant DANIEL COATS is the Director of National Intelligence and is sued in his individual capacity as well as his official capacity.  Director Coats is responsible for overseeing enforcement and implementation of the Proclamation by all Office of the Director of National Intelligence ("ODNI") staff.

30.     Defendant ODNI is an independent agency of the U.S. federal government which has specific responsibilities and obligations with respect to implementation of the Proclamation.

31.     Defendant LARRY EDWARD ANDRE, JR. is the Ambassador of the U.S. Embassy in Djibouti and is sued in his official capacity.  Ambassador Andre's authority includes the Consular Affairs section, and oversight of visa application processing and adjudication.

32.     Defendant DEVIN KENNINGTON is Consular Affairs Section Chief at the U.S. Embassy in Djibouti and is sued in his individual capacity as well as his official capacity.  Defendant Kennington is charged with assisting U.S. citizens and LPRs and their beneficiaries residing in Djibouti with visa and passport applications.

33.     Defendant CHAPMAN GODBEY is a Consular Officer and is sued in his individual capacity as well as his official capacity.  Defendant Godbey is responsible for interviewing and adjudicating visa and passport applications for U.S. citizens and LPRs and their beneficiaries.

34.     Defendant RYAN NOLAN, is a Consular Officer at the U.S. Embassy in Djibouti and is being sued in his individual capacity as well as his official capacity.  Defendant Nolan is

responsible for interviewing and adjudicating applications for U.S. citizens and LPRs and their beneficiaries residing in Djibouti.

35.     Defendant UNITED STATES EMBASSY IN DJIBOUTI is the overseas post for the United States located in Djibouti and is responsible for assisting and processing U.S. passport applications for U.S. citizens abroad.

## STATEMENT OF FACTS

### I.     The Proclamation

36.     The Proclamation, issued on September 24, 2017, prohibits the entry of all immigrants and certain categories of non-immigrants for nationals of Iran, Libya, Somalia, Syria, and Yemen.   The Proclamation provides for case-by-case waivers from the ban for individuals who can "demonstrate" that denial of entry "would cause undue hardship, . . . would not pose a threat to national entity, . . .and would be in the national interest."  (See Exhibit C, Presidential Proclamation No. 9645, 82 Fed. Reg. 45161 (Sept. 27, 2017), 3(c)).  The Proclamation provides several examples of circumstances in which waivers may be appropriate, and further requires the Secretary of State and the Secretary of Homeland Security to adopt guidance to establish when waivers may be appropriate for foreign nationals who would otherwise be banned.

37.     However, little guidance has been issued or publically promulgated to date.  The agencies do not appear to have established, nor have they provided any meaningful information to the public, about waiver application procedures, how waiver eligibility determinations are made, or whether any recourse exists for persons who are not considered for a waiver in the first instance.

38.     The Proclamation went fully into effect in December 2017, and immediately after, thousands of individuals, including many Plaintiffs in this action, reported receiving blanket

boilerplate denials of both visas and waivers, most before ever having had an opportunity to apply or to "demonstrate" that they meet the eligibility criteria described in the Proclamation. Some have been informed that their eligibility for a waiver is being considered, but have been waiting for many months without a decision in their cases.

39.     Public reports and the latest government statistics illustrate that the number of waiver grants has been "a miniscule percentage" of all these eligible for visas.  *Trump v. Hawaii,* 585 U.S. __ (2018) (Breyer, J., dissenting).  By all indications, the waiver process has been "a fraud." According to a former consular officer, ". . . there really is no waiver and the Supreme Court was correct to point out that the waiver is merely 'window dressing.'" (See Exhibit A, Decl. of Christopher Richardson, Esq.).

40.     Based upon all available data and information, Defendants have adopted a policy or practice of not instituting an orderly waiver process through which individuals may "demonstrate," as stated in the Proclamation, their eligibility for a case-by-case waiver.  (See Exhibit C, § 3(c), Presidential Proclamation).

41.     Defendants have further adopted a policy or practice of not providing information about the waiver process and have thereby hindered Plaintiffs' and their family members' ability to make a showing that they meet the relevant criteria.

42.     Defendants have also adopted a policy or practice of denying or stalling virtually all visa issuance and waiver grants under the Proclamation, and have not given consular officials the discretion to grant waivers.  Further, consular officers have failed to offer any meaningful guidance to Plaintiffs who are seeking waivers under the Proclamation.

43.     As set forth below, Defendants' failure to provide a meaningful, orderly, and accessible process through which individuals covered by the ban can demonstrate their eligibility for a

waiver violates the APA, the INA, and Plaintiffs' right to due process under the Fifth Amendment to the U.S. Constitution.

44.     Accordingly, Plaintiffs request that this Court order Defendants to immediately cease their unlawful policies and/or practices of refusing to grant requests for waivers under the Proclamation for visa applicants; retract visa denials issued before an orderly process is put in place; provide clear guidance that defines key words and sets well-defined standards for consular officers and applicants to use; provide an orderly process by which applicants may demonstrate their eligibility for a waiver; give full consideration for case-by-case waivers to all visa applicants as set forth in the Proclamation; issue a declaratory judgment ordering Defendants to adjudicate Plaintiffs' applications for waivers pursuant to Section 3(c) of the Proclamation, and issue a final determination on Plaintiffs' applications for immigrant visas within 15 days; and remove Chapman Godbey from his duties as a consular officer, or in the alternative enjoin Chapman Godbey from adjudicating petitions.

## II.     Legal Standard for Visa Processing and Issuance

45.     Upon approval of an 1-130 Petition, USCIS transfers the Petition to NVC for visa processing.

46.     NVC requests that the petitioner and the beneficiary of the approved 1-130 Petition to submit: (1) visa application form; (2) financial documents; and (3) supporting documents.

47.     NVC thereafter processes the petitioner and beneficiary's documents and transfers the petition to the appropriate U.S. embassy that the beneficiary resides in.

11

48.     Pursuant to the Foreign Affairs Manual, after the applicant has properly submitted the visa application form, medical exam, and paid the necessary fees, the applicant is provided an immigrant visa interview by a consular officer.  *See* 9 FAM 504.13(a)-(d).

49.     Pursuant to the Foreign Affairs Manual, "decisions to issue or refuse an immigrant visa application must be based on personal interview, during which the consular officer must ensure that all required documentation has been provided, that there is a legal basis for the applicant to immigrate, and that there are no ineligibilities that would affect visa issuance." *See* 9 FA.M 504.l 3(e)(l).

50.     Upon completion of the immigrant visa interview, the consular officer is tasked with making the determination as to whether the applicant shall be issued a visa or refused.  "Once an application has been executed, the consular officer must either issue the visa or refuse it.  A consular officer cannot temporarily refuse, suspend, or hold the visa for future action.  If the consular officer refuses the visa, he or she must inform the applicant of the provisions of law on which the refusal is based, and of any statutory provision under which administrative relief is available." *See* 9 FAM 5 04.13 (f) (emphasis added).


III.    <u>The **Presidential Proclamation Unconstitutionally Discriminates Against Visa Applicants Based on Country of Origin and Religion**</u>

51.     An analysis of the effects of the Proclamation shed light on the President's true intentions—to implement "a total and complete shutdown of all Muslims entering the United States" as promised while campaigning for the Presidency.  (See Exhibit O, Donald J. Trump Campaign, Donald J. Trump Statement on Preventing Muslim Immigration).

52.     Eighty-five percent of the people banned from entry and immigration to the United States are from the Muslim-majority countries listed in the Presidential Proclamation.[1]

53.     The Proclamation bans 76% of nonimmigrant visas applicants and 91% of immigrant visa applicants affected by Executive Order 13780.[2]

54.     The Presidential Proclamation purports to have the secular purpose of protecting the nation from terrorism-related public safety risks. The President claims banning nationals from the eight designated countries will achieve this aim.  However, nationals from the eight designated banned countries were already subjected to heightened scrutiny. The notion that Muslims are more likely to commit terrorism is a myth that is refuted by statistical data.  No immigrant from any of the banned Muslim majority countries has carried out a fatal terror attack within the U.S. in more than four decades.

55.     By blaming the targeted countries, Defendants are banning the countries that collectively make up the highest percentage of the total number of Muslim immigrants. Thus, Defendants are advancing a government policy that inhibits the free exercise of religion by disfavoring immigration by Muslims.  Defendant President Trump and Defendant Stephen Miller have also entangled themselves with religion through their repeated and continuous calls to ban Muslim immigrants.  (See Exhibits O-S).

## IV.   Case-by-Case Waivers Under the Proclamation

---

[1] *See* Pew Research Ctr., The Global Religious Landscape 45–50 (2012).
[2] Harsha Panduranga, Faiza Patel, & Michael Price, Extreme Vetting & the Muslim Ban 14 (2017). For State Department figures on total nonimmigrant U.S. visa types issued to foreign states, see Department of State – Bureau of Consular Affairs, FY 2016 Nonimmigrant Visas Issued, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY16%20NIV%20Detail%20Table.pdf (last accessed January 18, 2019). For State Department figures on U.S. immigrant visas issued to foreign states, see Department of State – Bureau of Consular Affairs, Table XIV: Immigrant Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories) Fiscal Years 2007- 2016, supra. Data from the tables above were used in combination with the visa issuance types exempted from Executive Order 13780 and Proclamation 9645 to calculate the total number of individuals in the new policy banned from entry in Panduranga, Patel, & Price, *supra*, at 14.

56.     Section 3 of the Proclamation contains a subsection entitled "Waivers," which states:

> Notwithstanding the suspensions of and limitation on entry set forth in section 2 of this proclamation, a consular officer, or the Commissioner, United States Customs and Border Protection (CBP), or the Commissioner's designee, as appropriate, may, in their discretion, grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended or limited if such foreign nationals demonstrate that waivers would be appropriate and consistent with subsections (i) through (iv) of this subsection [laying out waiver standards].

(See Exhibit C, § 3(c), Presidential Proclamation).

57.     The Proclamation explains that a waiver may be granted if, in a consular officer's or CBP's discretion, a foreign national has demonstrated that: (1) denial of entry "would cause the foreign natural undue hardship"; (2) his or her "entry would not pose a threat to the national security or public safety of the United States"; and (3) his or her "entry would be in the national interest." *Id.* § 3(c)(i).

58.     The Proclamation then specifies that while "case-by-case waivers may not be granted categorically," they "may be appropriate, subject to the imitations, conditions, and requirements set forth" in subsection (c), "in individual circumstances . . . ." *Id.* § 3(c)(iv).  It proceeds to give a number of examples of circumstances under which issuance of a waiver may be appropriate, including:

(A) the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the applicable effective date… of this proclamation, seeks to reenter the United States to resume that activity, and the denial of reentry would impair that activity;

(B) the foreign national has previously established significant contacts with the United States but is outside the United States on the applicable effective date ... of this proclamation for work, study, or other lawful activity;

(C) the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry would impair those obligations;

(D) the foreign national seeks to enter the United States to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry would cause the foreign national undue hardship;

(E) the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case ….

*Id.*

59. The Proclamation also instructs that, "[t]he Secretary of State and the Secretary of Homeland Security shall coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants." *Id*. § 3(c). It further directs the Secretaries to:

[A]ddress the standards, policies and procedures for:

(A) determining whether the entry of a foreign national would not pose a threat to the national security or public safety of the United States;

(B) determining whether the entry of a foreign national would be in the national interest;

(C) addressing and managing the risks of making such a determination in light of the inadequacies in information sharing, identity management, and other potential dangers posed by the nationals of individual countries subject to the restrictions and limitations imposed by this proclamation;

(D) assessing whether the United States has access, at the time of the waiver determination, to sufficient information about the foreign national to determine whether entry would satisfy the requirements of subsection (i) of this subsection; and

(E) determining the special circumstances that would justify granting a waiver under subsection (iv)(E) of this subsection.

*Id.* § 3(c)(ii).

## V.    The Waiver Process Under the Presidential Proclamation is Fraudulent

15

60.     The waiver process under the Proclamation is fraudulent and provides little to no guidance for how to qualify for a waiver.  The information Defendants have provided about how to qualify for a waiver has been non-existent or conflicting.

61.     Form denial letters provide further proof that the process is unclear and lacks meaningful guidance.  (See Exhibit M).

62.     There have been very few waivers actually provided under the Proclamation further showing that the process is fraud.

63.     Accounts from Plaintiffs and former consular officers make clear that the process is fraudulent and confusing.  (See Exhibits A-B and N).

64.     Consular officers in Djibouti, including Defendants Kennington and Godbey, have refused to accept documents detailing hardships by Plaintiffs and other immigrant visa applicants who qualify for a waiver under the Proclamation and refused to offer guidance to petitioners, including Plaintiffs, who are seeking waivers.  (See Exhibits DD1-DD3).

65.     Plaintiffs are left confused about the process and how to apply for and get approved for a waiver.


**A.      The Guidance Provided by Federal Officials About the Waiver Process Has Been Non-Existent or Conflicting**

66.     The Proclamation itself only provides scant details about the case-by-case waiver process.  Instead, it directs the Secretary of State and the Secretary of Homeland Security to develop specific guidance for consular officers and visa applicants on how the waiver provisions will be implemented. *Id.* § 3(c).

67.     Despite this clear mandate, the agencies have failed to provide any meaningful guidance. *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) ("The Government … has

offered no explanation for how these [discretionary waiver] provisions would function in practice: how would the 'national interest' be determined, who would make that determination, and when?").

68.     This lack of clarity has left applicants confused about applicable standards of eligibility for waivers—whether their hardships are undue, their contacts significant—and has left consular officers with the understanding that the goal is to deny waivers to the fullest extent possible. (See Exhibit A, Christopher Richardson Decl.).

69.     Existing guidance also does not explain how consular officers should consider the eligibility for a waiver of applicants who, like several Plaintiffs in this action, were interviewed prior to implementation of the Proclamation but were in administrative processing[3] at the time the ban went into effect, or for visa applicants whose applications were approved prior to implementation of the ban but who had not yet gotten their visas stamped in their passports. (See, e.g., Exhibit E, Findings of Fact and Conclusions of Law, *Alharbi v. Miller,* No. 1:18-cv-02435 (E.D.N.Y. filed April 25, 2018), ECF No. 20).

70.     All available evidence shows that Defendants are not providing any meaningful individualized consideration of waiver applicants' eligibility. Just days after the Proclamation went into effect, several organizations and attorneys began receiving reports from individuals

---

[3] Administrative processing is a period after a visa interview during which applicants undergo additional screening outside of "normal" visa processing. Maggio & Kattar & The Pennsylvania State University Law School's Center for Immigrants' Rights, Administrative Processing FAQ, 1, Penn. State L. Sch., https://pennstatelaw.psu.edu/sites/default/files/documents/pdfs/Immigrants/Administrative-Processing-FAQ.pdf (last visited Jan. 17, 2019). "Before issuing a visa, consular officers review different databases to determine if information exists that may impact individual eligibility for a visa. A 'hit' on a particular database occurs when there is a match between the visa applicant and a database. These hits may be based on criminal convictions, security risks, and prior visa overstays or denials (this list is non-exhaustive)." *Id.* A hit may also occur when an applicant's name is similar to the name of someone suspected of criminal activity. *Id.* at 4. "When an individual case has been tagged in a database, the Department of State, at the request of the consular post, may initiate administrative processing." *Id.* at 1. Cases filed by nationals of several countries are routinely placed in administrative processing. *Id.* at 3.

covered by the ban of pro forma, mass denials of both visas and waivers by consular offices in Armenia, Turkey, Djibouti, Dubai, Abu Dhabi, and elsewhere.  *See* Yeganeh Torbati & Mica Rosenberg, Exclusive: Visa Waivers Rarely Granted under Trump's Latest U.S. Travel Ban: Data, Reuters (Mar. 6, 2018), https://www.reuters.com/article/us-usaimmigration-travelban-exclusive/ exclusive-visa-waivers- rarely-granted-under-trumps-latest-u-stravel-ban-data-idUSKCN1GI2DW; Exhibit B, Jay Garison Decl.; *infra* Section VIII.

71.     Many of the individuals who were notified that they had been denied waivers, including Plaintiffs in this action, had never been informed about or provided an opportunity to apply for a waiver.  *See infra* Section VIII.

72.     Automatically denied individuals included those who had previously been informed that their visas had been approved.  *See infra* Section VIII.

73. The government has staunchly refused to provide meaningful information or to institute an orderly, predictable process by which individuals may apply for a case-by-case waiver.

74. Applicants are thus at a loss for what to do—they do not know whether to contact the embassy or whether the embassy will contact them; whether they should wait until administrative processing is completed or request a waiver while their cases are still pending administrative processing.

**B.     Denial Letters Issued by Consular Officers Provide Further Evidence of the Lack of Meaningful Guidance**

75.     Defendants have provided the consulates and embassies abroad with a template letter to provide to applicants when they have been denied a visa pursuant to the Proclamation. The letter has two options for a consular officer to select: (1) "Taking into account the provisions of the

Proclamation, a waiver will not be granted in your case"; or (2) "The consular officer is reviewing your eligibility for a waiver under the Proclamation." (See Exhibit M, Embassy Letter Regarding Eligibility for Waiver Under the Proclamation).  Plaintiffs in this suit have received such letters.

76.     These form letters further confirm that not all individuals are being considered for case-by-case waivers, in direct conflict with agency statements that "[a] consular officer will carefully review each case to determine whether the applicant is affected by the Proclamation . . . and, if so, whether the applicant qualifies for an exception or a waiver." (See Exhibit D, Dep't of State, "June 26 Supreme Court Decision on Presidential Proclamation 9645").  As set forth above, numerous denials were issued just days after the Proclamation went into effect, and many individuals who have received these form denials at the interview were told that their eligibility would not be considered and that they may not submit additional documents in support of such consideration.

## C.     Defendants Have Granted a "Miniscule Percentage" of Waiver Applications

77.     The overwhelming majority of waiver applicants have been denied or stalled by Defendants.

78.     In a letter dated February 22, 2018, the State Department disclosed that, as of January 8, 2018, only two waivers were granted to applicants of the banned countries out of at least 6,555 applicants who were eligible to be considered for waivers—a rejection rate of more than 99%. (See Exhibit F, Letter from Mary K. Waters).

79.     As of April 30, 2018, out of 27,129 applicants from banned countries who were ostensibly considered for waivers, only 579 had been "cleared" for waivers. That figure rose to

19

768 as of May 31, 2018.  Torbati & Rosenberg, *Exclusive: Visa Waivers Rarely Granted, supra*
Section V. A.  On the most favorable reading of those numbers, the rejection rate remains greater
than 98%.  *See Trump v. Hawaii,* 585 U.S. ___, 138 S. Ct. 2392, 2431 (2018) (Breyer, J.,
dissenting) ("That number, … however, when compared with the number of pre-Proclamation
visitors, accounts for a miniscule percentage of those likely eligible for visas, in such categories
as persons requiring medical treatment, academic visitors, students, family members, and others
belonging to groups that, when considered as a group (rather than case by case), would not seem
to pose security threats.").

80.     However, not all individuals "cleared" for waivers have been granted a waiver or issued a
visa.  Based on all available evidence, being "cleared" for a waiver simply means that the
consulate has forwarded the case for consideration for a waiver grant by the State Department in
Washington, DC.  (See Exhibit B, Jay Gairson Decl.).   Individuals "cleared" for waivers may
continue to be stalled and may not ultimately be granted a visa.  The percentage of persons who
have actually been granted a waiver and issued a visa is, based upon all available evidence,
considerably smaller than the bare 2 percent of individuals who have been "cleared" for
consideration for a waiver grant.


**D.     Former Consular Officers Have Confirmed the Absence of a Meaningful Waiver
         Process**

81.     Former consular officers have confirmed the absence of a meaningful waiver
consideration process.

82.     In a sworn affidavit submitted in related litigation in the Eastern District of New York
(*Alharbi v. Miller,* No. 18-cv-2435 (BMC) Doc. 42 (2018)), former consular official Christopher
Richardson wrote:

As a Consular officer previously employed by the State Department my impression and

interpretation of how we as officers were to apply the waiver process was as follows:

(a) They gave us a list of things and we would go down the list one by one until we were able to
determine at all possible cost that the person was not eligible to even apply for the waiver. My
understanding was no one is to be eligible to apply.

(b) If for some reason an applicant made it through the list and we had no choice but to
determine we could find an applicant eligible to apply, regardless of the [Presidential
Proclamation] instructions that we had "discretion to grant the waiver," we were not allowed to
exercise that discretion. We were mandated to send to Washington that we found this applicant
eligible to apply and Washington would then make the decision to grant or deny the waiver.

(See Exhibit A, Christopher Richardson Decl.; see also Exhibit H, Jeremy Stahl, "The Waiver

Process Is Fraud." (A second consular official submitted a declaration to the same effect)).

83.     Mr. Richardson further stated: "[T]here really is no waiver [process] and the Supreme

Court was correct to point out that the waiver [process] is merely 'window dressing.'" (See

Exhibit A, Christopher Richardson Decl.).  Mr. Richardson's description of the waiver process

has been corroborated by another consular officer.  (See Exhibit H, Jeremy Stahl, "The Waiver

Process Is Fraud").

84.     The statements of the consular officers reveal a process that conflicts with the plain text

of the Proclamation, the information provided by the State Department on its website and in

letters to U.S. senators, and arguments made by the government while defending the

Proclamation and the waiver in litigation challenging the ban.  As described by Mr. Richardson,

officers were instructed not to consider applicants for waivers in good faith and to seek to deny

eligibility to even apply for a waiver.  In addition, consular officers were not allowed to exercise

their discretion to grant a waiver even where they did consider an applicant to be eligible.

85.     Consistent with Mr. Richardson's representations, numerous visa applicants have stated

that when they attended their visa interviews, officers informed them that waivers are processed

in Washington, D.C. (See Exhibit B, Jay Gairson Decl.; *infra* Section VIII). This is in conflict with the State Department's claims that a visa applicant's eligibility for a waiver is determined by the consular officer at the time of the interview.

86.    As a result of the inconsistent statements, the absence of meaningful guidance, and the absence of an orderly process by which applicants may "demonstrate" their eligibility for a waiver, applicants do not know who is adjudicating their requests for waivers, what information they are considering, and what the standards really are to qualify for a waiver grant.

**E.    Consular Officers Including Defendants Kennington and Godbey Refuse to Accept Documents Detailing Hardships by Plaintiffs and other Immigrant Visa Applicants who Qualify for a Waiver Under the Proclamation**

87.    Consular officers at the U.S. Embassy in Djibouti are refusing to accept documents from immigration visa applicants, including Plaintiffs in this action, which demonstrate their hardships and show that they qualify for a waiver under the Proclamation.

88.    Defendants have been denying petitioners their immigrant visas without considering the documents that Plaintiffs and other petitioners have spent so long gathering, and have failed to provide further guidance about how to qualify for a waiver or who and where to provide proof of waiver qualification.  (See Exhibits DD1-DD3).

89.    This is a clear violation of statutory and constitutional law as it is a violation of the FAM and the procedural and substantive Due Process requirements of the Fifth Amendment of the United States Constitution.

**VI.    Defendants' Actions and Statements Demonstrate Their Anti-Immigrant and Anti-Muslim Policy And a Policy of Separating Families**

90.    Defendants have a demonstrated anti-immigrant and anti-Muslim policy, which includes a policy of separating immigrant and U.S. citizen and LPR families.

91.     Defendant President Trump has a long demonstrated history of being anti-immigrant and anti-Muslim dating back to before he was elected President.  Prior to his election, President Trump campaigned on the promise that he would ban Muslims from entering the United States. Then-candidate Trump issued a press release calling for "a total and complete shutdown of Muslims entering the United States" on December 7, 2015.  (See Exhibit O, Donald J. Trump Campaign, Donald J. Trump Statement on Preventing Muslim Immigration).

92.     The following day when asked what the customs process would look like for a Muslim non-citizen attempting to enter the United States, then-candidate Trump stated, "[T]hey would say, 'are you Muslim?'" Nick Glass, "Trump Not Bothered by Comparisons to Hitler," *POLITICO*, Dec. 8, 2015, available at https://www.politico.com/trump-muslims-shutdown-hitler-comparison.  Candidate Trump then went on to say that, if they answered yes, they would not be allowed into the country.  *Id.*

93.     Following litigation against the first travel ban leading to its replacement by a revised ban, President Trump issued a number of tweets criticizing the revision and calling for a return to the first travel ban.  Defendant Trump stated: "The Justice Dept. should've stayed with the original Travel Ban, not the watered down, politically correct version they submitted to S.C." (See Exhibits P1, Tweet from President Trump on June 5, 2017).   He also tweeted: "People, the lawyers and the courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!" (See Exhibit P2, Tweet from President Trump on June 5, 2017).

94.      Defendant Trump's statements regarding Muslims reveal that his intent, and the intent of the Proclamation, is to disfavor Islam and stigmatize Muslims.

95.     Defendant Miller has an anti-immigrant stance including his tactic of telling horror stories of isolated incidents involving crimes committed by noncitizens to incite and scare

people.  (See Exhibit S, Nahal Toosi, "Inside Stephen Miller's Hostile Takeover of Immigration Policy").  Defendant Miller was also the co-author of Executive Order 13679, otherwise known as the "Muslim Ban," which was challenged by a number of courts and eventually usurped by the current Proclamation.

96.     Defendant Miller's actions and statements regarding immigration and Muslims reveal his intent to disfavor Muslims.

97.     Defendant Nielsen has lied about the Trump Administration's family separation and anti-immigrant policies.  In a June 2018 tweet, she stated: "We do not have a policy of separating families at the border.  Period."  (See Exhibit U, Tweet by Department of Homeland Security Secretary Kirstjen Nielsen).  This directly contradicts Defendants' anti-immigrant policy and intentions of separating families at the border as detailed in a recently released draft report detailing Defendants' plan to separate children from their families and deport them without asylum hearings.  (See Exhibit T, Draft Memo Titled "Policy Options to Respond to Border Surge of Illegal Immigration").  The report further detailed the drafters' suggestion that the "increase in prosecutions would be reported by the media and it would have a substantial deterrent effect."

98.     Defendants' actions and statements show their intent to institute a policy that is both anti-immigrant and anti-Muslim and which separates families.

## VII.     Defendants Have a Long History of Untruthfulness and Misrepresenting Facts

99.     There is a long history of untruthfulness by the DOJ dating back to 1943 in *Hirabayashi v. United States,* 320 U.S. 81 (1943) when government lawyers made crucial misrepresentations

to the United States Supreme Court, a case which upheld a racial curfew imposed on Japanese

Americans during World War II as constitutional.

100.    The government's submissions in the case maintained that the curfew was a

constitutional response to the serious threat of a Japanese invasion of the West Coast.  However,

new archival findings show that military officials foresaw no Japanese invasion and were

planning for no such thing at the time they ordered mass action against Japanese Americans.  At

the time the Justice Department lawyers filed their brief in *Hirabayashi* emphasizing a threat of

invasion, they knew that top military officials had denied the risk of invasion in communications

to Congress.  (See Exhibit V, North Carolina Law Review Article).

101.    In 2013, government Counsel Frank Amanat was admonished by Senior District Judge

Edward R. Korman for "mischaracterizing" facts and engaging in a "cover up" of government

behavior in *Tummino v. Hamburg,* 12-cv-763 (2013), a case about the right to Plan B, an over-

the-counter contraceptive.  The Court acknowledged that Mr. Amanat had a pattern and practice

of using less than credible affidavits to support his position.  Judge Korman further went on to

say that Mr. Amanat had "absolutely no credibility" and was "basically lying" about the behavior

of the government.  (See Exhibit W, Judge Korman Admonishing Counsel Frank Amanat).

In *State of Texas et al., v. United States of America et al.,* No.1:14-cv-00254 Doc. 347 (2016),

the Court noted that, government attorneys ". . . knew the true facts and misrepresented those

facts to the citizens of 26 Plaintiff States, their lawyer and this Court on multiple occasions. . . ."

The government lawyers stated that the reason they were not candid with the Court was that they

either "lost focus on the fact" or that somehow "the fact receded in memory or awareness."  In

response, a U.S. District Court for the Southern District of Texas ordered that "any attorney

employed by the Justice Department in Washington, D.C., who appears, or seeks to appear, in a

court (state or federal) in any of the 26 Plaintiff's States annually attend a legal ethics course."
*Id.* (See Exhibit X, U.S. District Court for the Southern District of Texas 2016 Order
Admonishing DOJ Attorneys).

102.    In oral arguments before the U.S. Supreme Court in *Trump v. Hawaii*, Solicitor General
Noel Francisco misstated the core facts regarding President Trump's statements of animus
toward Muslims and was generally misleading.  According to the transcripts of the case, ". . . the
president has made crystal clear on Sept. 25 that he had no intention of imposing the Muslim
ban" he'd promised repeatedly during his presidential campaign.

103.    Francisco argued that the third attempt at a travel ban issued by the President on Sept. 24
had been "cured" of any potential religious animus that might otherwise make it unconstitutional
under the First Amendment, although time and again, Trump and the White House have said the
opposite of what Francisco represented to the Court.  (See Exhibit Y, Solicitor General Noel
Francisco Misstating the Core Facts about Trump's Statements of Animus Towards Muslims in
Oral Arguments).

104.    The Ninth Circuit recently ruled a Bivens remedy was available to a plaintiff when an
ICE attorney intentionally submitted a forged document in an immigration proceeding to
completely bar that immigrant from pursuing relief to which he was entitled.  *Lanuza v. Love*,
2018 WL 3848507, at *6 (9th Cir. Aug. 14, 2018).  Interestingly, even after the government
immigration attorney's forgery was discovered in 2012 and reported to the Board of Immigration
Appeals, nobody at the Executive Office for Immigration Review reported him to the inspector
general or other oversight authority, which is why he was not terminated until his victim sued
two years later.  "There can be no doubt that Love—who intentionally, and illegally, submitted
falsified evidence in an immigration hearing—is not protected by qualified immunity. . . ." *Id.* at

29.  "The district court reasoned, 'It would be obvious to any reasonable federal official that submitting false evidence in an immigration proceeding, or in any judicial or quasi-judicial proceeding for that matter, is unlawful and unconstitutional and would undermine the integrity of such a proceeding.'" *Id.* at 29 note 10.   "At its core, this case is about a lie, and all the ways it was used, over several years, to defraud the courts.  Government attorneys are given great power and with that power comes great responsibility." *Id.* at 31. (See Exhibit Z, Government Immigration Attorney's Forgery Barring Immigrant From Pursuing Relief Covered up by the BIA).

105.    The DOJ recently admitted to an error in statistics in a report released last year that erroneously linked terrorism to immigration.  DOJ Representative Michael H. Allen, Deputy Assistant Attorney General for Policy, Management and Planning wrote a letter admitting to an error in statistics which implied a link between terrorism in the United States and immigration, but refused to correct it.  (See Exhibit AA, DOJ Representative Michael H. Allen).

106.    A Consular Affairs Section Chief stated the following regarding the untruthfulness of DOJ:

> I know DoJ is lying on this stuff. That's why I'm pissed. They lied about your client never applying for a passport in our office even though the system record was there for them to see with very specific case notes and date stamps. Now they're lying about this stuff being classified. I haven't disclosed contents of anything to you, just existence, and I'm doing that because I know DoJ is lying. May 11, 2018 at 4:10 PM

(See Exhibit BB, WhatsApp Messages from State Department Employee).

107.    Chloe Dybdahl, an attorney advisor, in the advisory opinions division of the Office of Legal Affairs of the Visa Office, Bureau of Consular Affairs, of the U. S. Department of State has made misrepresentations on numerous occasions in declarations for the government regarding immigration cases.  In *Nine Iraqi Allies v. Kerry,* 168 F. Supp. 3d 268 (D.D.C. 2016),

Dybdahl stated in her sworn declaration that the applications of a number of plaintiffs had been "refused" despite the case status tracker's indication that they were in "administrative processing." (See Exhibit CC1, Declarations from Chloe Dybdahl).

108.     Additionally, in *Alharbi v. Miller,* No. 18-cv-2435 (BMC) Doc. 42 (2018) Dybdahl again filed a sworn declaration stating that Plaintiff-Beneficiaries had been provided visa approval notices when in fact they had all been refused. (See Exhibit CC2, Declarations from Chloe Dybdahl).

## VIII.   Plaintiffs

### Almerdaei / Almardaei Family DJI2017672022

109.     Plaintiff Suood Almerdaei is an LPR and is the wife of Plaintiff Ali Alawi Almardaei. She currently resides in Brooklyn, New York.

110.     Plaintiff Ali Alawi Almardaei is a national of Yemen. He currently resides in Djibouti.

111.     Plaintiffs Suood Almerdaei and Ali Alawi Almardaei have five children: S.S., age 17; F.S., age 15; K.S., age 11; H.S., age 8; and M.S., age 5. They currently reside in the United States with their mother.

112.     Plaintiff-Beneficiary Ali Alawi Almardaei, has petitioned for an immigrant visa three times. Plaintiff-Beneficiary Ali Alawi Almardaei's step-father petitioned for him and the Petition was denied. Plaintiff-Beneficiary Ali Alawi Almardaei's father-in-law petitioned for his wife and Ali Alawi Almardaei was the derivate. This Petition was also denied. Plaintiff-Beneficiary Ali Alawi Almardaei's wife is the Petitioner for his current Form I-130 Petition. Plaintiff-Beneficiary has been cooperating with U.S. Embassies abroad for over 16 years and has still not gotten his visa.

113.    Plaintiff-Petitioner Suood Almerdaei filed a Form I-130 Petition on behalf of Plaintiff Ali Alawi Almardaei on January 22, 2016 and the Petition was subsequently approved on May 31, 2016.  Plaintiff-Beneficiary Ali Alawi Almardaei had his immigrant interview on January 24, 2018 at the U.S Embassy in Djibouti.  Plaintiff-Beneficiary Ali Alawi Almardaei received a Notice of Visa Ineligibility and Waiver Review Denial form dated January 24, 2018.  Plaintiff-Beneficiary Ali Alawi Almardaei's immigrant visa application was refused in late 2018.

114.    Plaintiffs' daughter H.S. has a tumor in her head and has had two surgeries.  If she does not get better she will be required to have another surgery.

115.    Plaintiffs' children have also suffered emotionally and have been struggling with school as a result of the stress of being separated from their father.

116.    The Plaintiffs are suffering financial hardship.  Plaintiff Suood Almerdaei works part time and not only pays her bills but sends money to Plaintiff Ali Alawi Almardaei to cover his expenses.  She is currently $30,000 in debt.


**Aldaylam / Al-Gaad Family DJI2018663006**

117.    Plaintiff Amr Aldaylam is a United States citizen and the husband of Plaintiff Samah Al-Gaad. He currently resides in Brooklyn, New York.

118.    Plaintiff Samah Al-Gaad is a national of Yemen. She currently resides in Ras Rambo Djibouti, Djibouti.

119.    Plaintiffs Amr Aldaylam and Samah Al-Gaad have two children: R.A., age 12 and M.A., age 9.

120.    Plaintiff-Petitioner Amr Aldaylam filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Samah Al-Gaad on December 5, 2013.  Plaintiff Amr Aldaylam requested their

interview to be rescheduled, but it never was. Plaintiff-Petitioner Amr Aldaylam filed another Form I-130 Petition on behalf of Plaintiff-Beneficiary Samah Algaad, R.A., and M.A. on March 2, 2016 and the Petition was approved on March 28, 2018. Plaintiffs Samah Algaad, R.A. and M.A. had interviews in September 2018 at the U.S. Embassy in Djibouti.  Plaintiff-Beneficiary Samah Algaad received a Notice of Visa Ineligibility and Waiver Review Eligibility after previous approval dated September 19, 2018.  Plaintiff-Beneficiary Samah Algaad's immigrant visa application is currently in Administrative Processing.

121.    Plaintiffs' daughter, M.A. has an obstruction in her nasal passage and has bilateral nasal discharge. She feels discomfort and has trouble breathing because of her condition and it is recommended that she have an adenoidectomy.

122.    Plaintiffs suffer financial hardship.  Plaintiff Amr Aldaylam works approximately 55 hours per week to cover his expenses and his family's expenses in Djibouti. He sends roughly $1,400 a month to cover their food and rent.


**Kaid / Saleh Family SAA2004831018**

123.    Plaintiff Abdo Ali Saleh is a United States citizen and the father of Plaintiff Ali Abdo Ali Saleh.  He currently resides in Brooklyn, New York.

124.    Plaintiff Ali Abdo Ali Saleh is a national of Yemen. He currently resides in Yemen.

125.    Plaintiff-Petitioner Abdo Ali Saleh filed a Form I-130 Petition on behalf of his Beneficiary son originally in 1994 and it has been delayed for years.

126.    Plaintiff-Beneficiary Ali Abdo Ali Saleh is married to Plaintiff-Beneficiary Alfiah Abod Ahmed. They have five children: M.A.A.S., M.A.A.S. (2), R.A.A.S., E.A.A.S., and A.A.A.S. Plaintiff Ali Abdo Ali Saleh's children are derivatives of his I-130 Petition.

127.    Plaintiff-Beneficiary Ali Abdo Ali Saleh had his interview on June 21, 2017.  Plaintiff-
Beneficiary Ali Abdo Ali Saleh received a Notice of Visa Ineligibility and Waiver Review
Eligibility form for himself and his derivative children dated October 9, 2018.  Plaintiff-
Beneficiary Ali Abdo Ali Saleh and Plaintiff-Beneficiary Alfiah Abod Ahmed Kaid's immigrant
visa applications are currently in Administrative Processing.

128.    Plaintiff Abdo Ali Saleh has a history of stroke and is constantly worried about his son
and grandchildren's safety.

129.    Plaintiffs suffer financial hardship and Plaintiff Abdo Ali Saleh sends money on a
monthly basis to his son and family in Djibouti and Yemen.


**Almansouri / Alhanash Family DJI2017700023**

130.    Plaintiff Jamal Almansouri is a United States citizen and the husband of Plaintiff Nabila
Alhanash.  He resides in Brooklyn, New York.

131.    Plaintiff Nabila Alhanash is a national of Yemen.  She currently resides in Djibouti City,
Djibouti.

132.    Plaintiff-Petitioner Jamal Almansouri filed a Form I-130 Petition on behalf of Plaintiff-
Beneficiary Nabila Alhanash on June 26, 2011 and the Petition was approved on November 20,
2016.  Plaintiff-Beneficiary Nabila Alhanash had an immigrant interview on January 21, 2018 at
the U.S. Embassy in Djibouti and was subsequently approved for an immigrant visa.  Plaintiff-
Beneficiary Nabila Alhanash received a Notice of Visa Ineligibility and Waiver Review
Eligibility form from the U.S. Embassy in Djibouti dated January 30, 2018 after previous
approval.

133.    Plaintiff Jamal Almansouri recently suffered from a heart attack in late 2018.  He is currently being treated for this condition.  He is alone and it is difficult for him to deal with his heart condition while taking care of his two young children without his wife.

134.    Plaintiffs suffer financial hardship and Plaintiff Jamal Almansouri in the United States sends money to his wife, Plaintiff Nabila Alhanash in Djibouti.

**Saleh / Algudari Family SAA1998535002**

135.    Plaintiff Arwa Saleh is an LPR and the wife of Plaintiff Faisal Algudari.  She currently resides in Brooklyn, New York.

136.    Plaintiff-Petitioner Arwa Saleh first petitioned for her husband's visa in 1998.  He was denied a visa because he was found to have done khat at some time previously.  However, khat is legal in both Yemen and Djibouti.  (See Exhibit FF,), and Embassy officials have stated that khat is not a valid reason to deny an immigrant visa.  (See Exhibits EE1-EE2).

137.    In 2018, Plaintiff-Beneficiary went to Djibouti to for a medical exam and for his immigrant visa interview.  He was told by Embassy officials that after he had the exam, he would be scheduled for an interview for his visa.  However, this did not happen, and Plaintiff-Beneficiary Faisal Algudari still has not had an interview.

138.    Plaintiff-Beneficiary Faisal Algudari suffers medical issues.  He is paralyzed on the left side of his body.  He had a stroke as a result of high blood pressure, which is exacerbated by the fact that he is separated from his family.  The stroke caused him to go into a coma for three days.  He has been extremely sad and depressed as a result of delays in his visa process and being separated from his family.  He fainted about a month ago after hearing that his visa has been

further delayed.  His doctor has advised him not to get too stressed or sad.  He needs to be reunited with his family.


**Rajeh Family DJI2016780014, DJI2016787047, DJI2016780015**

139.    Plaintiff Tawfik Rajeh is a United States citizen and the father of Plaintiffs A.R., Siham Rajeh, and Atef Rajeh. He currently resides in Flushing, New York.

140.    Plaintiffs A.R., Siham Rajeh, and Atef Rajeh are all nationals of Yemen and they currently reside in Yemen.

141.    Plaintiff-Petitioner Tawfik Rajeh filed Form I-130 Petitions on behalf of Plaintiff-Beneficiaries A.R., Siham Rajeh, and Atef Rajeh in February 2010.  There was an eight year delay but they were finally approved.  Plaintiff-Beneficiaries A.R., Siham Rajeh, and Atef Rajeh had their immigrant interviews on January 7, 2018.   Plaintiff-Beneficiaries A.R., Siham Rajeh, and Atef Rajeh each received a Notice of Visa Ineligibility and Waiver Review Denial form after previous approval dated January 7, 2018.  Plaintiff-Beneficiaries A.R., Siham Rajeh, and Atef Rajeh's immigrant visa applications are all currently in Administrative Processing.

142.    Plaintiffs suffer financial hardship.  Plaintiff Tawfik Rajeh supports the Plaintiffs, his children, financially. He only makes $50,000 a year and works seven days per week. He owns a deli and a candy store and needs help running the store not only because of his age but because his other children who are in the United States are currently in school. Plaintiff Tawfik Rajeh has borrowed $30,000 in loans from friends and family as well as a $7,000 loan from a bank. He sends $600 per month to his children in Yemen and when his children lived in Jordan and Djibouti he also covered their cost of living.


**Saleh / Qasem Family DJI2017694027, DJI2017694028, DJI2017694025**

143.     Plaintiff Wadhah Mohammed Saleh is an LPR and is the father of Plaintiffs H.W.M.Q., H.W.M.Q. (2), and N.W.M.Q. He currently resides in Dearborn, Michigan.

144.     Plaintiff-Petitioner Wadhah Mohammed Saleh filed Form I-130 Petitions on behalf of Plaintiff-Beneficiaries H.W.M.Q., H. W.M.Q. (2), and N.W.M.Q on April 25, 2016 and the Petitions were approved on June 13, 2017.  Plaintiff-Beneficiaries H.W.M.Q., H. W.M.Q. (2), and N.W.M.Q had their immigrant interviews at the U.S. Embassy in Djibouti on April 25, 2018. Plaintiff-Beneficiaries H.W.M.Q., H. W.M.Q. (2), and N.W.M.Q each received a Notice of Visa Ineligibility and Waiver Denial form after previous approvals dated April 10, 2018.  Plaintiff-Beneficiaries H.W.M.Q., H. W.M.Q. (2), and N.W.M.Q were all subsequently refused immigrant visas on October 3, 2018, December 20, 2018, and November 5, 2018, respectively.

145.     Plaintiff Wadhah Mohammed Saleh has an ill American child, M.S., who is the half sibling of H.W.M.Q., H. W.M.Q. (2), and N.W.M.Q.   M.S. has been diagnosed with Acute Myeloid Leukemia, a serious form of childhood cancer and is currently being treated at the Children's Hospital of Michigan.  As a result, M.S. undergoes intensive chemotherapy and radiation treatment which requires prolonged hospital and clinic visits. This makes it difficult for Plaintiff Wadhah Mohammed Saleh to travel to Yemen to visit his children as M.S. is very ill and requires his primary caretakers to be with him.  Allowing reunification would provide relief to Plaintiffs and their family during this challenging time.

146.     Plaintiffs suffer financial hardship and Plaintiff Wadhah Mohammed Saleh in the United States sends money to his family in Djibouti.


**Mohsin / Yahya Family DJI2017803006**

147.    Abdlarzak Mohsin is a United States citizen and the husband of Plaintiff Bahia

Mohmmed Ahmed Yahya.  He currently resides in Lackawanna, New York.

148.    Plaintiff Bahia Moahmmed Ahmed Yahya is the wife of Plaintiff Abdlarzak Mohsin and

a national of Yemen.  She currently resides in Djibouti, while awaiting her immigrant visa

approval.  Plaintiffs Abdlarzak Mohsin and Bahia Mohammed Ahmed Yahya have eight

children: B.M., age 17; T.M., age 15; M.M., age 14; W.M., age 13; J.M. age 10, Y.M., age 9;

M.M. (2),  age 7; and M,M. (3), age 4.  All of the children are U.S. citizens and currently reside

in Lackawanna, New York.

149.    Plaintiff-Petitioner Abdlrazak Mohsin filed a Form I-130 Petition on behalf of Plaintiff-

Beneficiary Bahia Mohammed Ahmed Yahya twice. The first Petition was filed on June 16,

2015.  It was originally denied, but eventually approved on October 10, 2017.  The second

Petition was filed on July 3, 2017 and approved on February 10, 2018.  Plaintiff-Beneficiary

Bahia Mohammed Ahmed Yahya had an immigrant interview on March 6, 2018 at the U.S.

Embassy in Djibouti.  Plaintiff-Beneficiary Bahia Mohammed Ahmed Yahya's visa application

is now in Administrative Processing.

150.    Plaintiff-Petitioner Abdlarzak Mohsin is 89 years old and suffers from dementia and

forgetfulness.  It is imperative that his wife gets her visa application approved because he needs

assistance from his wife.

151.    Plaintiffs suffer financial hardship and Plaintiff Abdlrazak Mohsin in the U.S. sends

money to his wife, Plaintiff Bahia Mohammed Ahmed Yahya in Djibouti.


**El Burati / Mohsin Family DJI2016704029**

152.   Plaintiff Amin El Burati is a United States citizen and the husband of Plaintiff Kubla Mohsin. He currently resides in Bridgeview, Illinois.

153.   This petition has two derivatives.  Plaintiffs Amin El Burati and Kubla Moshin have one child: Nada El Burati and she is married.  Fadhle El Burati is the stepson of Plaintiff Amin El Burati and is also married.

154.   Plaintiff-Petitioner Amin El Burati filed a Form I-130 Petition on February 19, 2013 on behalf of Plaintiff-Beneficiary Kubla Mohsin.  The Petition was approved on June 13, 2013. Plaintiff-Beneficiary Kubla Mohsin had an immigrant interview on May 22, 2018 at the U.S. Embassy in Djibouti.  Plaintiff-Beneficiary Kubla Mohsin received a Notice of Visa Ineligibility and Waiver Review Eligibility form dated May 24, 2018.  Plaintiff-Beneficiary Kubla Mohsin's immigrant visa application is currently in Administrative Processing.

155.   Plaintiff Amin El Burati had an arthroplasty in September 2018.  He is high risk for falling and is experiencing deteriorating vision.  He needs help with physical tasks and needs his wife to be his caretaker.  He also suffers from diabetes and kidney problems.  Doctors have documented his need for 24 hour care for his condition.


**Al-Nomair Family DJI2017672004, DJI2017706004, DJI2017672005**

156.   Plaintiff Mar Abdo Kaid (a.k.a. Faiz Ali Al-Nomair) is a United States citizen and the father of Plaintiffs Saqr, Hilal, and Emtethal Al-Nomair. He currently resides in Richmond, Virginia.

157.   Plaintiff Mar Abdo Kaid, also named Faiz Abdo Kaid, changed his name by court order to Faiz Ali Al-Nomair.

158.    Plaintiffs Hilal Al-Nomair, Emtethal Al-Nomair, and Saqr Al- Nomair are children of Plaintiff Faiz Ali Al-Nomair and are nationals of Yemen. Saqr, Hilal, and Emtethal currently reside in Djibouti.

159.    Plaintiff-Petitioner Faiz Ali Al-Nomair filed a Form I-130 Petition on behalf of Beneficiaries Emtethal Faiz Ali Al-Nomair, Hilal Faiz Ali Al-Nomair, and Saqr Faiz Ali Al-Nomair, in June 2007 and the Petition was approved on June 25, 2008.  Emtethal Faiz Ali Al-Nomair, Hilal Faiz Ali Al-Nomair, and Saqr Faiz Ali Al-Nomair had their immigrant interviews on October 10, 2017 at the U.S. Embassy in Djibouti.  Plaintiffs-Beneficiaries then received notices that their visas were denied and that they were ineligible for waivers.  They subsequently received forms from the Embassy that they were eligible for waivers.  Plaintiff-Beneficiaries immigrant visa applications are currently in Administrative Processing.

160.    Plaintiff Faiz Ali Al-Nomair has five children who have been issued immigrant visas.

161.    One child, M.A., has been diagnosed with epilepsy and needs rehabilitation that specializes in seizures with intensive physiotherapy.  The family separation is causing additional hardship among Plaintiffs and family members as it adds additional stress.  Plaintiff Faiz Ali Al-Nomair also suffer from chronic asthma and hyperlipidemia.

162.    Plaintiff Faiz Ali Al-Nomair has endured financial hardship. He is the only one providing financial support to the beneficiaries and sends roughly $1,400 on a monthly basis to pay for their living expenses.


**Ahmed / Al Yafai Family DJI2017632001**

163.    Plaintiff Norh A. Ahmed is a United States citizen and the wife of Plaintiff Hussein Al Yafai.  She currently resides in Queens, New York.

164.    Plaintiff Hussein Al Yafai is a Yemeni national and currently resides in Djibouti.

165.    Plaintiff-Petitioner Norh A. Ahmed filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Hussein Al Yafai.  The Petition was subsequently approved on August 10, 2016. Plaintiff-Beneficiary Hussein Al Yafai received a Notice of Visa Ineligibility and Waiver Denial form dated March 5, 2018.  Plaintiff-Beneficiary Hussein Al Yafai's immigrant visa application is currently in Administrative Processing.

166.    While in Yemen, Plaintiffs were in a bad accident.  Plaintiff Norh A. Ahmed broke her spine and miscarried Plaintiffs' baby.  She required surgery and is still in a lot of pain.  Plaintiff Norh A. Ahmed's brother was also injured and in a coma from the accident.  The medical care Plaintiff received in the hospital was later determined by American doctors to be inadequate.

167.    Plaintiffs are suffering as a result of being separated, the accident, are struggling financially.  It is very unsafe in Yemen and Plaintiffs' friends have been kidnapped.


**Alnagger / Saibaan Family DJI2017653008**

168.    Plaintiff Shathia Abdo Alnagger is a United States citizen and is the daughter of Plaintiff Nakhla Saleh Hussein Saibaan.  She currently resides in Stockton, California.

169.    Plaintiff Nakhla Saleh Hussein Saibaan is a Yemeni national and currently resides in Djibouti.

170.    Plaintiff-Petitioner Shathia Abdo Alnaggar filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Nakhla Saleh Hussein Saibaan on November 30, 2015 and the Petition was subsequently approved on April 18, 2017.  Plaintiff Nakhla Saleh Hussein Saibaan had her immigrant interview at the U.S. Embassy in Djibouti on January 25, 2018.

171.    Plaintiff-Beneficiary Nakhla Saleh Hussein Saibaan received a Notice of Visa Ineligibility and Waiver Denial form after previous approval dated January 25, 2018.  Plaintiff-Beneficiary Nakhla Saleh Hussein Saibaan subsequently received a Notice of Visa Ineligibility and Waiver Review Eligibility form.  Plaintiff-Beneficiary Nakhla Saleh Hussein Saibaan's immigrant visa application is currently in Administrative Processing.

172.    Plaintiff Nakhla Saleh Hussein Saibaan has a cyst on her ovary that is causing her serve pain and makes it difficult for her to walk.  She is also alone in Yemen.  All of her family is in the United States.  She also suffers from high blood pressure, which requires her to be on medication and getting medicine in Yemen is difficult.

173.    Plaintiff Shathia Abdo Alnaggar also suffers financial hardship. She is a stay-at-home mother and her husband is in medical school. She had to sell her gold jewelry to send $2000 to her mother, Plaintiff Nakhla Saleh Hussein Saibaan, to help pay for her stay in Djibouti.


**Abashaar / Hauter Family DJI2016787030**

174.    Plaintiff Ahlam Hauter is a United States citizen and is the wife of Plaintiff Abdulrakib Abashaar. She currently resides in Astoria, New York.

175.    Plaintiff Abdulrakib Abashaar is a national of Yemen.  He currently resides in Yemen.

176.    Plaintiffs Ahlam Hauter and Abdulrakib Abashaar have two children: A.A.A., age 4; and M.A.A., age 3, who are both U.S. citizens.

177.    Plaintiff-Petitioner Ahlam Hauter filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Abdulrakib Abashaar and the Petition was subsequently approved.  Plaintiff-Beneficiary Abdulrakib Abashaar had his immigrant interview on December 2, 2017 at the U.S. Embassy in Djibouti and he was refused a visa at the Embassy.  Plaintiff-Beneficiary Abdulrakib

Abashaar received a Notice of Visa Ineligibility and Waiver Review Denial form dated December 18, 2018.  Plaintiff-Beneficiary Abdulrakib Abashaar's immigrant visa application is currently in Administrative Processing.

178.    Plaintiff Abdulrakib Abashaar has a liver condition which is life threatening.  He requires medical attention and medicine in the United States.

179.    Plaintiffs are suffering hardships including those related to Plaintiff Abdulrakib Abashaar's medical condition, the trauma of being separated, the war in Yemen, and the difficulties in traveling to Djibouti.


**Saeed / Nagi Family DJI2017744012**

180.    Plaintiff Rasam Obaid Saeed is United States citizen and the wife of Plaintiff Emad Nasr Abdulrab Nagi. She currently resides in Yemen.

181.    Plaintiff Emad Nasr Abdulrab Nagi is a national of Yemen. He currently resides in Yemen.

182.    Plaintiffs Rasam Obaid Saeed and Emad Nasr Abdulrab Nagi have one child: N.N., age 3, who is a United States citizen.

183.    Plaintiff-Petitioner Rasam Obaid Saeed filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Emad Nasr Abdulrab Nagi on September 28, 2016 and the Petition was approved on August 15, 2017 and Plaintiff-Beneficiary Emad Nasr Abdulrab Nagi subsequently had an immigrant interview at the U.S. Embassy in Djibouti.  Plaintiff-Beneficiary Emad Nasr Abdulrab Nagi received a Notice of Visa Ineligibility and Waiver Eligibility after previous approval form dated July 24, 2018.  Plaintiff-Beneficiary Emad Nasr Abdulrab Nagi's immigrant visa is now is Administrative Processing.

184.    Plaintiff Rasam Obaid Saeed's son was diagnosed with asthma and continues to get worse while living in Yemen due to the air quality.

185.    Plaintiffs suffer financial hardship and Plaintiff Rasam Obaid Saeed's family in the U.S. sends money to Plaintiff Rasam Obaid Saeed and her family in Yemen.

**Mohamed / Sharoh Family KLL2017748002**

186.    Plaintiff-Petitioner Mansour Mohamed is a United States citizen and the husband of Plaintiff Ghaithah Sharoh.  He resides in Detroit, Michigan.

187.    Plaintiff Ghaithah Sharoh is a Yemen national and currently resides in Malaysia.

188.    Plaintiff-Petitioner filed a Form I-130 Petition on behalf of his wife, Plaintiff-Beneficiary Ghaithah Sharoh in 2016 and had an interview at the U.S. Embassy in Kuala Lumpur, Malaysia on December 7, 2017.

189.    Plaintiff-Beneficiary Ghaithah Sharoh received a Notice of Visa Ineligibility and Waiver Denial form dated November 1, 2018 from the U.S. Embassy in Kuala Lumpur, Malaysia. Plaintiff-Beneficiary Ghaithah Sharoh's immigrant visa application is currently in Administrative Processing.

190.    Plaintiff Mansour Mohamed is 75 years old and suffers from diabetes and has a bad knee which causes him mobility issues.  He needs his wife to be with him and help take care of him.

191.    Plaintiffs suffer financial hardship as Plaintiff Mansour Mohamed supports his wife in Kuala Lumpur.  He has traveled to see her on a few occasions, which is expensive and difficult for him due to his age, mobility issues, and medical issues.

**Alharbi / Taher Family DJI2017775010**

192.     Plaintiff Majdy Alharbi is a United States citizen and the husband of Plaintiff Anhar Abdullah Taher. He currently resides in Cheektowaga, New York.

193.     Plaintiff Anhar Abdullah Taher is a national of Yemen. She currently lives in Djibouti.

194.     Plaintiffs Majdy Alharbi and Anhar Abdullah Taher have three children: M.M.A.S.A., age 8; H.M.A., age 6; and R.M.A., age 3. One child is a U.S. citizen and lives with Plaintiff Majdy Alharbi in the United States.

195.     Plaintiff-Petitioner Majdy Alharbi filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Anhar Abdullah Taher on October 17, 2016 and the Petition was approved on September 1, 2017.  Plaintiff Anhar Abdullah Taher had her immigrant interview on August 15, 2018 at the U.S. Embassy in Djibouti and she was subsequently approved for an immigrant visa. Plaintiff-Beneficiary Anhar Abdullah Taher received a Notice of Visa Ineligibility and Waiver Review Eligibility after previous approval dated August 15, 2018.  Plaintiff-Beneficiary Anhar Abdullah Taher's immigrant visa application is currently in Administrative Processing.

196.     Plaintiffs' daughter, H.M.A., has problems with walking and is in need of surgery to correct her walking. She currently walks on her toes. She does physical therapy each week.

197.     Plaintiffs suffer from financial hardship.  Plaintiff Majdy Alharbi has borrowed roughly $40,000 from friends and family and sends his wife $2,500 per month to cover family living expenses in Djibouti.

**Ali Family DJI2016682012**

198.     Plaintiff Abdelbaset Ali is a United States citizen and the father of Plaintiff Jamilah Ali. He currently resides in Utica, New York.

199.     Plaintiff Jamilah Ali is a national of Yemen. She currently resides in Djibouti.

200.    Plaintiff-Petitioner Abdelbaset Ali filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Jamilah Ali on November 7, 2011 and the Petition was approved on August 22, 2014.  Plaintiff Jamilah Ali has not yet had her immigrant interview.

201.    Plaintiff Jamilah Ali suffers from heatstroke and rashes from living in Djibouti.  She is also suffering from depression because she is separated from her family.

202.    Plaintiff Abdelbaset Ali is currently undergoing chemotherapy for chronic lymphocytic leukemia.  The process has also caused marriage problems and financial difficulties as Plaintiff Abdelbaset Ali is currently not working.

203.    Plaintiffs suffer financial hardship and Plaintiff Abdelbaset Ali sends money from the United States to PLaintiff Jamilah Ali and her family in Djibouti.


**Algazali Family DJI2016716101**

204. Plaintiff Esmayl Algazali is a United States citizen and the father of Plaintiff Latifiya Algazali. He currently resides in Hamtramck, Michigan.

205.    Plaintiff Latifiya Algazali is a national of Yemen. She currently resides in Hamtramck, Michigan with her father.

206.    Plaintiff Latifiya Algazali is married and has six children.  Her youngest child, E.A., and husband are derivatives of her Form I-130 Petition.

207.    Plaintiff-Petitioner Esmayl Algazali filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Latifiya Algazali over 20 years ago and the Petition was approved.  Plaintiff Latifya Algazali had her immigrant interview on June 3, 2018 at the U.S Embassy in Djibouti.

208.     Plaintiff Latifiya Algazali was approved and issued a visa on October 28, 2018 and arrived to the U.S. on November 5, 2018.  Plaintiff Latifiya Algazali's derivatives have not been issued visas and their immigrant visa applications are currently in Administrative Processing.

209.     Plaintiffs are suffering hardships as a result of being separated.  Plaintiff Latifiya Algazali's depression has gotten worse since arriving to the U.S. She is separated from her husband and son.  Plaintiff Latifiya Algazali also suffers from a number of medical conditions including diabetes and high blood pressure.  She has also had three panic attacks due to her constant fear about her family living in Djibouti.


**Abdullah / Saleh Family DJI2017699011**

210.     Plaintiff Fayah Abdullah is a United States citizen and the wife of Plaintiff Ghyath Abdulrahman Saleh. She currently resides in Djibouti.

211.     Plaintiff Ghyath Abdulrahman Saleh is a national of Yemen. He currently resides in Djibouti.

212.     Plaintiffs Fayah Abdullah and Ghyath Abdulrahman Saleh have one child: R.S., age 1. He is a United States citizen.

213.     Plaintiff-Petitioner Fayah Abdullah filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Ghyath Abdulraham Saleh on December 23, 2016 and the Petition was approved on June 22, 2017.  Plaintiff Ghyath Abdulrahman Saleh had his immigrant interview on July 9, 2018 at the U.S. Embassy in Djibouti.  Plaintiff-Beneficiary Ghyath Abdulrahman Saleh received a Notice of Visa Ineligibility and Waiver Review Eligibility after previous approval dated July 8, 2018.  Plaintiff-Beneficiary Ghyath Abdulrahman Saleh's immigrant visa application is currently in Administrative Processing.

44

214.    Plaintiffs Fayah Abdullah and Ghyath Abdulrahman Saleh require sleeping pills because they both struggle with depression and stress as a result of their financial and emotional hardships resulting from the war in Yemen, their immigrant visa application process, and the separation of their family.

215.    Plaintiffs' parents are both suffering medical issues including pain, disability, and sadness and depression as a result of the family separation they are experiencing, which require support from their children.

216.    Plaintiffs suffer financial hardship and Plaintiff Ghyath Saleh send money to his wife Fayah Abdullah in Yemen.


**Kassem / Saleh Family SAA2010617002**

217.    The Estate of Mohamed Mutaher Kassem represents Mohamed Mutaher Kassem, who was a United States citizen and was the husband of Plaintiff Wafa Abdulla Saleh.  He was killed in Yemen while visiting family.

218.    Plaintiff Wafa Abdulla Saleh is a national of Yemen. She currently resides in Djibouti.

219.    Plaintiff Wafa Abdulla Saleh and Mohamed Mutaher Kassem and have four children: A.M.M., age 13; O.M.M., age 10; A.M.M, age 6; and S.M.M., age 16. The children are U.S. Citizens and live in Djibouti with their mother.

220.    Plaintiff-Petitioner Mohamed Ahmed Mutaher filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Wafa Saleh, which was subsequently approved.  Plaintiff-Beneficiary Wafa Abdulla Saleh had two interviews at the U.S. Embassy in Djibouti.  Plaintiff-Beneficiary Wafa Abdulla Saleh received a Notice of Visa Ineligibility and Waiver Review Eligibility notice from

the U.S. Embassy in Djibouti dated October 17, 2018.  Plaintiff-Beneficiary Wafa Abdulla

Saleh's immigrant visa application is currently in Administrative Processing.

221.    Plaintiff Wafa Abdulla Saleh is a widow and is struggling to raise her four children in

Djibouti.   She faces additional hardships including dealing with the loss of her husband,

financial hardship living in Djibouti, and the stress of taking care of four children by herself.


**Alghaithy Family DJI2016778051, DJI2016778050, DJI2016778049**

222.    Plaintiff Nada Alghaithy is a United States citizen and the mother of Plaintiffs B.H.A.,

G.H.A., and S.H.A.  She currently lives in Rochester, New York.

223.    Plaintiffs B.H.A., G.H.A., and S.H.A are all nationals of Yemen. They currently reside in

Sudan.

224.    Plaintiff-Petitioner Nada Alghaithy filed Form I-130 Petitions on behalf of Plaintiff-

Beneficiaries B.H.A., G.H.A., and S.H.A, which were all subsequently approved.  Plaintiff-

Beneficiaries B.H.A., G.H.A., and S.H.A's immigrant visa applications are all currently in

Administrative Processing.

225.    The family faces hardships as a result of being separated. Plaintiff Nada Alghaithy has

three natural born United States citizen children, (the younger siblings of Plaintiffs B.H.A.,

G.H.A., and S.H.A) living in the U.S. but Plaintiff Nada Alghaithy divides her time between the

U.S. and Sudan.  Plaintiff Nada Alghaithy suffers from stress as a result of the long drawn out

visa process and has started to take medication for it.


**Sharif / Al Hamri Family DJI2016795012, DJI2016792080**

226.    Plaintiff Saeed Sharif is a United States citizen and the husband of Plaintiff Saba Al

Hamri.  He currently resides in Oakland, California.

227.    Plaintiff Saba Al Hamri is a national of Yemen.  She currently resides in Djibouti.

228.    Plaintiffs A.S., N.S., and F.S. are the children of Plaintiffs Saeed Sharif and Saba Al

Hamri. They are nationals of Yemen and currently reside in Djibouti with their mother.

229.    Plaintiff-Petitioner Saeed Sharif filed Form I-130 Petitions on behalf of Plaintiff-

Beneficiaries Saba Al-Hamri, A.S., N.S., and F.S. on June 22, 2016 and the Petitions were

subsequently approved.  Plaintiff-Beneficiary F.S.'s Petition was approved on September 2,

2016.  Plaintiff-Beneficiary A.S.'s Petition was approved on September 6, 2016.  Plaintiff-

Beneficiary Saba Al-Hamri's Petition was approved on September 8, 2016. Plaintiff-Beneficiary

N.S.'s Petition was approved on October 24, 2016.  Plaintiff-Beneficiaries Saba Al-Hamri, A.S.,

N.S., and F.S. had their immigrant interviews on January 4, 2018 at the U.S. Embassy in

Djibouti.  Plaintiff-Beneficiaries Saba Al-Hamri, A.S., N.S., and F.S. each received a Notice of

Visa Ineligibility and Waiver Denial form after previous approval dated January 4, 2018.

Plaintiff-Beneficiaries A.S. and N.S.'s visas were issued in January 2019.  Plaintiff-Beneficiaries

Saba Al-Hamri and F.S.'s immigrant visa applications are currently in Administrative

Processing.

230.    Plaintiffs suffer hardship as a result of the war in Yemen, family separation, and the

expenses of being in Djibouti.

231.    Plaintiffs suffer financial hardship.  Plaintiff Saeed Sharif works two jobs, 14-hour shifts,

and seven days a week to provide for his family in Djibouti.  This causes him great stress, which

he is currently taking medication for.

**Al-Saidi / Alkuaif Family DJI2016724028**

232.    Plaintiff Tawfik Al-Saidi is an LPR and the wife of Plaintiff Etidal Alkuaif.  He currently resides in Detroit, Michigan.

233.    Plaintiff Etidal Alkuaif is a national of Yemen. She currently resides in Djibouti.

234.    Plaintiffs Tawfik Al-Saidi and Etidal Alkuaif have five children: A.A., age 21; F.A., age 19; F.A. (2), age 16; G.A., age 11; and F.A. (3), age 8. The children are derivatives on the Form I-130 Petition.

235.    Plaintiff-Petitioner Tawfik Al-Saidi filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Etidal Alkhuaif, and their derivative children.   The Petition was approved on June 11, 2014. Plaintiff-Beneficiary Etidal Alkuaif and derivatives A.A., F.A., G.A., and F.A. (2) and F.A. (3) had their immigrant interview on January 22, 2018 and the Petition was subsequently approved.  Plaintiff-Beneficiary Etidal Alkuaif and derivatives A.A., F.A., G.A., and F.A. (2) and F.A. (3) received a Notice of Visa Ineligibility and Waiver Review Denial after previous approval.  Plaintiff-Beneficiary Etidal Alkuaif and derivatives A.A., F.A., G.A., and F.A. (2) and F.A. (3)'s immigrant visa applications are currently in Administrative Processing.

236.    Plaintiffs suffer financial hardship. Plaintiff Tawfik Al-Saidi has spent over $30,000 to bring his family to the United States. His monthly income is $2,700.  He works overtime and sends roughly $2,300 to his family in Djibouti to cover all of their expenses.  He is also in debt to his cousin for $10,000. There are occasions where he cannot cover his own expenses as he struggles to cover the living expenses for his family in Djibouti.


**Al-Wajih / Al Malki Family DJI2017743012, DJI2017743008, DJI2017743023**

237.    Plaintiff Mohamed Al-Wajih is a United States citizen and the father of Plaintiffs Kawkab Al Malki and Abdurahman Al Malki. He currently resides in the Bronx, New York.

238.    Plaintiffs Kawkab Al Malki and Abdurahman Al Malki are nationals of Yemen.  They currently reside in Djibouti.

239.    Plaintiff Kawkab Al Malki and was 31 weeks pregnant as of October 31, 2018.  Her husband is a U.S. citizen.  Plaintiff Abdurham Al Malki is married to Plaintiff Asma Abdulhamid Alquhaif.

240.    Plaintiff-Petitioner Mohamed Al Wajih filed a Form I-130 Petition on behalf of Plaintiff-Beneficiaries Abdurahman Al Malki and Kawkab Al Malki on September 2005 and the Petition was approved on December 5, 2005.  Plaintiff-Beneficiary Abdurahman Al Malki and derivatives had their immigrant interviews on October 10, 2018 at the U.S. Embassy in Djibouti. Plaintiff-Beneficiary Kawkab Al Malki received a Notice of Visa Ineligibility and Waiver Denial form after previous approval dated February 22, 2018.  Plaintiff-Beneficiary Kawkab Al Malki's immigrant visa application is currently in Administrative Processing.  Plaintiff-Beneficiary Abdurahman Al Malki's immigrant visa application is currently in Administrative Processing. Plaintiff Asma Abdulhamid Alquhaif received a visa approval notice but her visa has not yet been issued and her immigrant visa application is currently in Administrative Processing.

241.    Plaintiffs are suffering financial hardship and Plaintiff Mohamed Al-Wajih's family in the United States sends money to his family in Djibouti.


**Al-Okam/ Aldafri Family DJI2017792002, DJI2017798007, DJI2017792005**

242.    Plaintiff Mohamed Taher Aldafri is a United States citizen and is the husband of Plaintiff Amal Al-Okam and the father of Plaintiffs A.A. and S.A.  He currently resides in Chicago, Illinois.

243.    Plaintiff Amal Al-Okam is a national of Yemen. She currently resides in Yemen.

244.    Plaintiffs Mohamed Taher Aldafri and Amal Al-Okam have two children: A.A., age 5 and S.A., age 3.  They currently reside with their mother in Djibouti.

245.    Plaintiff-Petitioner Mohamed Taher Aldafri filed a Form I-130 Petition on behalf of Plaintiff-Beneficiaries Amal Esmail Al-Okam (his wife), and A.A. and S.A. (his children) on September 21, 2015 and the Petitions were approved on October 4, 2017.  Plaintiff-Beneficiaries Amal Esmail Al-Okam, A.A., and S.A. had their immigrant interviews on July 22, 2018 at the U.S. Embassy in Djibouti.  A second interview was conducted on October 8, 2018 for their Consular Report of Birth Abroad (CRBA) applications. Plaintiff-Beneficiary Amal Esmail Al-Okam received a Notice of Visa Ineligibility and Waiver Review Eligibility form dated July 22, 2018.  Plaintiff-Beneficiary Amal Esmail Al-Okam's immigrant visa application is currently in Administrative Processing.   Plaintiff-Beneficiaries A.A. and S.A.'s immigrant visa applications have been refused.

246.    Plaintiff Mohamed Taher Aldafri has psychological problems. He has been diagnosed with schizophrenia and depression and is taking medication. Plaintiff Mohamed Taher Aldafri has been in and out of medical centers for treatment.  His last visit was in July 2018.

247.    Plaintiffs have suffered hardships related to the war in Yemen, Plaintiff Amal Esmail Al-Okam giving birth to her son in a war zone, her father and son both getting injured, and her experience with the U.S. Embassy in Djibouti.

**Al Ghazali Family DJI2017834009**

248.    Plaintiff Mutei Al Ghazali is a United States citizen and the father of Plaintiff M.M.N.A. He currently resides in Fresno, California.

249.    Plaintiff M.M.N.A. is a national of Yemen. She currently resides in Yemen.

250.    Plaintiff-Petitioner Mutei Al Ghazali filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary M.M.N.A on September 16, 2016.  The Petition was approved on October 27, 2017. Plaintiff-Beneficiary M.M.N.A had her immigrant interview in October 2018 at the U.S. Embassy in Djibouti. Plaintiff-Beneficiary M.M.N.A received a Notice of Visa Ineligibility and Waiver Review Eligibility form dated October 2, 2018.  Plaintiff-Beneficiary M.M.N.A's immigrant visa application is currently in Administrative Processing.

251.    Plaintiff M.M.N.A's entire family is in the United States, except for her grandfather who she resides with in Yemen. This visa process and the war in Yemen has taken a toll on her mental health and she is depressed.

**Saeed Family SAA2006674010**

252.    Plaintiff Abdasalam Saeed is a United States citizen and is the father of Plaintiff Geab Saeed.  He currently resides in Watsonville, California.

253.    Plaintiff Geab Saeed is a national of Yemen.  He currently resides in Egypt.

254.    Plaintiff-Petitioner Abdasalam Saeed filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Geab Saeed.  Plaintiff-Beneficiary Geab Saeed's immigrant visa application is currently in Administrative Processing.

255.    Plaintiff Geab Saeed's wife and children live in the United States with Plaintiff Abdasalam Saeed and Plaintiff Geab Saeed has not seen his family in over a year.

Plaintiffs suffer financial hardship.  Plaintiff Abdasalam Saeed provides financial support to Plaintiff Geab Saeed to pay for his expenses.

**Zabara / Al Nehmi Family DJI2017526026**

256.    Plaintiff Mona Abass Zabara is a United States citizen and lives in Yemen.  She is the wife of Plaintiff Waled Mohammed Al Nehmi, who is a national of Yemen.  He also resides in Yemen.

257.    Plaintiff-Petitioner Mona Abass Zabara filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Waled Mohammed Al Nehmi.  Plaintiff-Beneficiary Waled Mohammed Al Nehmi. had an immigrant visa interview at the U.S. Embassy in Djibouti on October, 24, 2017 and he was approved for a visa. Plaintiff-Beneficiary Waled Mohammed Al Nehmi received a Notice of Visa Ineligibility and Waiver Denial form from the U.S. Embassy in Djibouti dated January 24, 2018.  Plaintiff-Beneficiary Waled Mohammed Al Nehmi's immigrant visa application is currently in Administrative Processing.

258.    Plaintiff Waled Mohammed Al Nehmi suffers from a number of medical issues including high cholesterol, high blood pressure, and diabetes.  He has issues with his eye that cause problems with his vision and requires surgery.

259.    Plaintiffs suffer financial hardship as a result of Plaintiff Waled Mohammed Al Nehmi not being able to work.  Plaintiff Mona Abass Zabara used to work as a school teacher when she lived in the United States but is no longer working in Yemen.  Plaintiff Mona Abass Zabara and Plaintiffs' children are struggling adjusting to the life in war-torn Yemen, especially after living in the United States.  Plaintiffs' oldest daughter refuses to go to school in Yemen because she is afraid her school will be bombed.

**Al Najar Family DJI2017623014**

260.    Plaintiff Naif Al Najar is a United States citizen and the husband of Plaintiff Somayah Al Najar.  He currently resides in Brooklyn, New York.

261.    Plaintiff Somayah Al Najar is a native of Yemen and she currently resides in Yemen. Plaintiffs Somayah Al Najar and Naif Al Najar are the parents of Plaintiff M.A., 8 years old, who is also a native of Yemen and who lives in Yemen.

262.    Plaintiff-Petitioner Naif Al Najar filed I-130 Petitions on behalf of Plaintiff-Beneficiaries Somayah Al Najar and M.A.  Plaintiffs were scheduled for an immigrant visa in interview at the U.S. Embassy in Djibouti on November 7, 2017 and they were immediately rejected without an interview because of the way Somayah Al Najar's hijab looked in her photo.  They attended an interview on December 26, 2017 where they were told by the consular officers that they could not get visas because of the President's Ban.  They subsequently received refusal notices. Plaintiff-Beneficiaries Somayah Al Najar and M.A.'s immigrant visas are both currently in Administrative Processing.

263.    Plaintiff Naif Al Najar is suffering from medical issues and has heart valve problems.  He also experiences sadness and depression as a result of being separated from his wife and son.

264.    Plaintiffs are suffering financial hardship as a result of being separated and traveling to and from Djibouti for immigrant visa interviews.


**Arevalo / Alhagag Family DJI2017750001**

265.    Plaintiff Diana Arevalo is a United States citizen who resides in Ventura, California.  She is the wife of Plaintiff Yahya Amer Alhagag.

266.    Plaintiff Yahya Amer Alhagag is a national of Yemen who currently resides in Yemen.

267.    Plaintiff-Petitioner Diana Arevalo filed an I-130 Petition for her husband, Plaintiff-Beneficiary Yahya Amer Alhagag on December 27, 2016.  Plaintiff-Beneficiary's visa was delayed and in 2018 Plaintiffs contacted a local congresswoman to help expedite the process but he still has not received his visa.  Plaintiff-Beneficiary Yahya Amer Alhagag's immigrant visa application is currently in Administrative Processing.

268.    Plaintiff Diana Arevalo suffers from epilepsy and seizures.  They are exaggerated by stress.  As a result of her stress and anxiety related to her husband's long drawn out visa application process and the stress of him living in war-torn Yemen, her seizures have increased. After hearing he was denied his visa recently, she suffered a major seizure and went into cardiac arrest. She has had to increase her medication which has other side effects such as vertigo and dizziness.

269.    Plaintiffs suffer financial hardship and Plaintiff Diana Arevalo sends money from the United States to her husband, Plaintiff Yahya Amer Alhagag in Yemen.


**Nasser Family SAA2005829002, SAA2005829003**

270.    Plaintiff Abdo Ahmed Nasser is a United States and the father of Plaintiffs Ghamdam Nasser, age 30, and Mokhtar Nasser, age 31.  He currently resides in New York, New York.

271.    Plaintiffs Ghamdam Nasser and Mokhtar Nasser are nationals of Yemen and currently live in Yemen.

272.    Plaintiff-Petitioner Abdo Ahmed Nasser filed I-130 Petitions on behalf of his children, Plaintiff-Beneficiaries Ghamdam Nasser and Mokhtar Nasser and the Petitions were subsequently approved.  Plaintiff-Beneficiaries Ghamdam Nasser and Mokhtar Nasser received a

54

notice of visa illegibility and waiver denial form from the U.S. Embassy in Djibouti dated May 3, 2018.  Plaintiff-Beneficiary Mokhtar Nasser received a notice of visa ineligibility and eligibility for waiver form from the U.S. Embassy in Djibouti dated July 3, 2018.  Plaintiff-Beneficiaries Ghamdam Nasser and Mokhtar Nasser's immigrant visa applications are currently in Administrative Processing.

273.    Plaintiffs are suffering as a result of their visa denial and delays.  Plaintiff-Petitioner has not seen his family in over four years.  His children are in Yemen with his wife, who went there to be with their children.  They were in Djibouti but it is too expensive so they went back to war-torn Yemen.  It is not safe in Yemen.  Plaintiffs are suffering financial hardship due to the cost of supporting the family in Djibouti and Yemen.  Plaintiffs are also suffering family separation.


**Alghaithi / Algaradi Family BMB2017763014**

274.    Plaintiff Hanan Fahmi Alghaithi is a United States citizen and the wife of Plaintiff Wazea Abdualkader Algaradi.  She currently resides in the Bronx, New York.

275.    Plaintiff Wazea Abdualkader Algaradi is a national of Yemen who currently resides in India.

276.    Plaintiff-Petitioner filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Wazea Abdualkader Algaradi in 2017.  Plaintiff-Beneficiary Wazea Abdualkader Algaradi had an immigrant visa interview at the U.S. Embassy in Mumbai, India on September 10, 2018.  He was then told by a consular officer that he would not be issued a visa due to the Proclamation. Plaintiff-Beneficiary received an immigrant visa application denial notice and notice of eligibility for a waiver dated September 10, 2018.  Plaintiff-Beneficiary Wazea Abdualkader Algaradi's immigrant visa application is currently in Administrative Processing.

277.    Plaintiff Wazea Abdualkader Algaradi moved to India to study and is earning a master's degree.  Plaintiffs have suffered hardships as a result of the war in Yemen, and the fact that their family has been separated due to the delay in Plaintiff Wazea Abdualkader Algaradi's visa application.  Plaintiff Hanan Fahmi Alghaithi had her baby alone without her husband due to the fact that his visa has still not been issued.  Plaintiff is sad that her family has been separated and that her husband missed the birth of their first child.  She is now struggling to raise their child alone.


**Shohatee / Yahya Family SAA2001774019**

278.    Plaintiff Nehmah Ahmed Shohatee is a United States citizen and is the brother of Plaintiff Mustafa Ahmed Yahya, a national of Yemen.

279.    Plaintiff-Petitioner Nehmah Ahmed Shohatee filed an I-130 Petition on behalf of her brother, Plaintiff-Beneficiary Mustafa Ahmed Yahya, and his derivative wife and their five children.  They had an interview at the U.S. Embassy in Djibouti and were not denied.  The Embassy officials requested more tests and information and the Petition was revoked on September 21, 2017 and Plaintiffs subsequently appealed the decision.  Plaintiff-Beneficiary Mustafa Ahmed Yahya's immigrant visa (along with the visas of his derivatives) is currently in Administrative Processing.

280.    Plaintiff-Beneficiary Mustafa Ahmed Yahya and his wife and children have been stuck in Djibouti waiting for their visa approvals.  The children have gotten sick and the older children are suffering because they have not been able to go to school.  The family is suffering a number of hardships including financial hardship and the hardship as a result of having to move to Djibouti to flee from their home in Yemen, which is in a war zone.

**Muthana / Qasem Family YTC 2017726002, YTC2017726001**

281.    Plaintiff Suriah Mohamed Muthana is United States citizen and the daughter of Plaintiffs

Mohamed Qasem and Samerah Ahmed Musa.  She currently resides in Melvindale, Michigan.

282.    Plaintiffs Mohamed Qasem and Samerah Ahmed Musa are Yemeni nationals who

currently reside in Egypt.

283.    Plaintiff-Petitioner Suriah Mohamed Muthana filed Form I-130 Petitions on behalf of

Plaintiff-Beneficiaries Mohamed Qasem and Samerah Ahmed Musa they were subsequently

approved.  Plaintiffs received approval notices in March 2017.  Plaintiff-Beneficiaries Mohamed

Qasem and Samerah Ahmed Musa had their immigrant interviews on October 23, 2017 at the

U.S. Embassy in Cairo, Egypt at which point they were told by embassy officials that everything

would be fine and that they would receive their visas.  After long delays, Plaintiff-petitioner

emailed her Senator who then emailed the Embassy inquiring about the adjudication of Plaintiff-

Beneficiaries' visas. The embassy said the applications were still in Administrative Processing.

One year later on September 25, 2018, Plaintiff-Beneficiaries had a second interview at the

embassy where embassy officials took Plaintiff-Beneficiaries' passports.  Plaintiff-Beneficiaries'

immigrant visas are currently in Administrative Processing.

284.    Plaintiff Suriah Mohamed Muthana suffers from sadness and depression as a result of her

parents' visa applications being delayed.  She suffers digestion issues as a result of the stress and

suffers from inflammation and is unable to process food.  Plaintiff Samerah Ahmed Musa also

suffers medical issues.  She had surgery for a tumor on her throat and her thyroid has been

removed so she is not able to properly digest food.  She had to go to Egypt to receive medical

care because the medical care is Yemen is not sufficient.  However, this is only a temporary

solution and she requires better medical care in the U.S. She also suffers from depression as a result of being separated from her family.

**Saleh Family SAA2010801013**

285.    Plaintiff Abdullah Ali Saleh is a United States citizen and the father of Plaintiff Meethak Abdullah Ali Saleh, a national of Yemen.  Plaintiff Meethak Abdullah Ali Saleh currently resides in Yemen.

286.    Plaintiff-Petitioner Abdullah Ali Saleh filed a Form I-130 Petition on behalf of Plaintiff-Beneficiary Meethak Abdullah Ali Saleh.  After having his Petition approved, Plaintiff-Beneficiary had an immigrant visa interview at the U.S. Embassy in Djibouti.  He was asked to take a medical and DNA test, which he passed.  Plaintiff-Beneficiary was told that he would be contacted by the embassy about his visa.  He waited a month in Djibouti for his visa to be adjudicated but it was not.  After being robbed, he went back home to Yemen.  Plaintiff-Beneficiary's immigrant visa is currently in Administrative Processing.

287.    Plaintiff Abdullah Ali Saleh suffers medical issues including diabetes, high blood pressure, and high blood sugar.  He takes medications for these conditions but they are worsened by the stress and anxiety of having his son in war-torn Yemen while he is awaiting the adjudication of his visa.  Plaintiff Abdullah Ali Saleh lives in fear that his son will die in Yemen. Plaintiff Meethak Abdullah Ali Saleh's home has bullet holes from the war and he is living in a dangerous environment.

288.    Plaintiffs also suffer from financial hardship because Plaintiff Meethak Abdullah Ali Saleh is unable to work in Yemen and everything, including food is expensive.  Plaintiff Abdullah Ali Saleh supports his son financially but he is also struggling because he has injuries

58

as a result of a car accident and surgery so he is also unable to work.  Plaintiff Abdullah Ali

Saleh is in debt more than $25,000 from supporting his son in Yemen.

**Haimed / Yahya Family DJI2017789009**

289.    Plaintiff Ahmed Yahya Haimed is a United States citizen and the son of Plaintiff Qublah

Tahar Yahya.  He currently resides in Modesto, California.  Plaintiff Qublah Tahar Yahya is a

Yemeni national who currently lives in Yemen.

290.    Plaintiff-Petitioner Ahmed Yahya Haimed filed a Form I-130 Petition on behalf of

Plaintiff-Beneficiary Qublah Tahar Yahya which was subsequently approved.  Plaintiff-

Beneficiary had an interview at the U.S. Embassy in Djibouti.  The embassy officials requested

DNA and proof that Plaintiff-Beneficiary Qublah Tahar Yahya was Plaintiff-Petitioner Ahmed

Yahya Haimed's biological mother.  Plaintiffs got the test, which they subsequently passed.

Plaintiffs have since been waiting to hear back about the status of Plaintiff-Beneficiary's visa.

Plaintiff-Beneficiary's immigrant visa is currently in Administrative Processing.

291.    Plaintiff Qublah Tahar Yahya suffers from medical issues including diabetes for which

she takes medication, but the medication is very expensive.  Plaintiff Ahmed Yahya Haimed's

father is currently very ill and he wants his family to be reunited.  Plaintiff Ahmed Yahya

Haimed's father suffers from a number of medical conditions including lymphoma, untreated

diabetes, and Alzheimer's disease.   Plaintiff Ahmed Yahya Haimed is very concerned about the

health and safety of his mother, as she is stuck in war-torn Yemen, which is very dangerous.

292.    Plaintiffs suffer from financial hardship as a result of helping to support Plaintiff Qublah

Tahar Yahya in Yemen and pay for her food and medication.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of the Administrative Procedures Act
### (Against All Defendants)

293.     Plaintiffs re-allege and incorporate by reference statements above as if set forth fully herein.

294.     The APA provides a waiver of sovereign immunity that allows a person to sue the federal government over unlawful agency action for non-monetary damages.  5 U.S.C. § 702.  The sovereign immunity waiver found in the APA applies to suits that seek relief other than money damages, which generally includes suits for injunctive and declaratory relief.  *See, e.g., Trudeau v. FTC,* 456 F.3d 178, 186 (D.C. Cir. 2006); *Sabhari v. Reno,* 197 F.3d 938, 943 (8th Cir. 1999) (challenge to the denial of an immigrant visa petition); *Shah v. Chertoff,* No. 3:05-CV-1608-BH (K) ECF, 2006 U.S. Dist. LEXIS 73754, (N.D. Tex. 2006) (challenge to denial of an L-1A visa extension).

295.     Pursuant to the APA, a person who is suffering a legal wrong because of agency action, or who is adversely affected by agency action within the meaning of a relevant statute, is entitled to judicial review.  5 USC §702.  "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 USC §551(13).  Thus an agency action may include the denial of a visa petition or an application for adjustment, for example.  It can also include the agency's failure to adjudicate a visa petition or adjustment application.

296.     Additionally, a number of courts have held that the statute must clearly grant discretion to the Department of Homeland Security ("DHS"); thus, because the INA does not grant DHS discretion to deny an I-130 visa petition, these courts concluded that INA § 242(a)(2)(B)(ii) does

not bar review of such denials. *See, e.g., Ginters v. Frazier,* 614 F.3d 822 (8th Cir. 2010); *Ruiz v. Mukasey,* 552 F.3d 269 (2d Cir. 2009); *Ayanbadejo v. DHS,* 517 F.3d 273 (5th Cir. 2008).

297.   The Eleventh Circuit has similarly found that a district court retained review under INA § 242(a)(2)(B)(ii) over statutory eligibility issues related to Temporary Protected Status (TPS) although the ultimate grant of TPS was within the unreviewable discretion of DHS.   *Mejia Rodriguez v. DHS,* 562 F. 3d 1137 (11th Cir. 2009).

298.   Further, the APA prohibits federal agency action that is "arbitrary and capricious," an abuse of discretion, or "not in accordance with the law," or conduct "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D).

299.   The Supreme Court confirmed that exceptions to judicial review under the APA are to be read narrowly, and that many actions "committed to agency discretion" nonetheless remain reviewable in *Weyerhaeuser Co. v. United States Fish and Wildlife Service, et al.,* 139 S. Ct. 361 (2018).  The Court stated that although "use of the word 'may' certainly confers discretion on the agency," such discretion is not unfettered, and does not eliminate the requirement that the agency abide by the mandates of the applicable law.  *Id.* at 371.

300.   Accordingly, agency actions in implementing the waiver provisions of the Proclamation are reviewable because the Proclamation provides clear standards against which to judge the agency's actions.

301.   Defendants have a non-discretionary duty under the Proclamation to develop standards to guide visa applicants in compiling their applications for waivers and for consular officers to reference in adjudicating waiver and visa applications.  (See Exhibit C, § 3(c), Presidential Proclamation).

302.    Defendants have failed to promulgate such guidance and have nonetheless proceeded in denying or stalling waivers and visas. Defendants have also failed to follow existing procedures prescribed by the INA, implementing regulations, and the FAM in issuing these denials. In failing to develop or follow any procedures, Defendants have acted arbitrarily and capriciously and in contravention of the Proclamation, the INA, and the U.S. Constitution, and they have thus violated the APA.

303.    Defendants have also failed to follow their own stated policy by failing to create an orderly process for waiver applications and by failing to consider all visa applicants for a waiver.

304.    Defendants' violations of these laws have harmed and continue to harm Plaintiffs by exposing them to economic loss and indefinitely denying them access to their families and adequate medical care.

## COUNT TWO
## Violation of Immigration and Nationality Act
### (Against All Defendants)

305.    Plaintiffs re-allege and incorporate by reference statements above as if set forth fully herein.

306.    The INA prohibits discrimination in the issuance of immigrant visas based on nationality, place of birth, or place of residence.  8 U.S.C. § 1152(a)(1)(A).  The INA's implementing regulations specify the procedures for issuance or denial of a visa.  22 C.F.R. 42.81; 22 C.F.R. 41.121; 22 C.F.R. § 40.6.  Under these regulations, a denial must be based on legal grounds and made in conformance with the INA.

307.    In denying waivers and visas to Plaintiffs based on their country of origin or nationality, Defendants have acted arbitrarily and capriciously and not in accordance with the INA.

308.    Defendants' actions have resulted in the indefinite—and possibly permanent—separation of U.S. citizens and U.S. LPRs from their family members in contravention of Congress' purpose in enacting the INA: promoting family reunification.  Defendants' conduct is in not in accordance with the INA.

309.    Defendants have failed to follow existing procedures prescribed by the INA and implementing regulations and the FAM in issuing these visa denials.  In failing to develop or follow any procedures, and instead basing their decisions on applicants' country of origin or nationality, Defendants have violated the INA.

310.    Defendants' violations of these laws have harmed and continue to harm Plaintiffs by exposing them to economic loss and indefinitely denying them access to their families and adequate medical care.

## COUNT THREE
### Fifth Amendment Procedural Due Process Violation
### (Against All Defendants)

311.    Plaintiffs re-allege and incorporate by reference statements above as if set forth fully herein.

312.    Procedural Due Process requires that procedural application of the law be fair and just, such that individuals are not subjected to the arbitrary exercise of governmental authority.

313.    Accordingly, Procedural Due Process requires that an individual be entitled to notice and an opportunity to be heard before the government can lawfully deprive him or her of an interest that is protected under the Due Process Clause, to wit: life, liberty or property.

314.    The Due Process Clause of the Fifth Amendment guarantees procedural due process rights, including the right to fair and impartial processes, and applies to foreign nationals. Those due

process rights are implicated by the deprivation of a fundamental liberty interest, e.g., family integrity, and they may also arise from statute. *See Lanza v. Ashcroft,* 389 F.3d 917, 927 (9th Cir. 2004) ("The due process afforded aliens stems from those statutory rights granted by Congress and the principle that '[m]inimum due process rights attach to statutory rights.'") (alteration in original) (quoting *Dia v. Ashcroft*, 353 F.3d 228, 239 (3d Cir. 2003). The INA and its implementing regulations mandate various procedures for the processing of visas, procedures which Defendants have failed to follow.

315.   The Due Process Clause of the Fifth Amendment of the U.S. Constitution further guarantees all individuals equal protection under the law.

316.   The blanket denials of visas to applicants from banned countries without the opportunity to demonstrate their eligibility for a waiver from the Proclamation, together with statements made by Defendants concerning their intent and the application of the travel ban, makes clear that Defendants are targeting individuals for discriminatory treatment based on their country of origin or nationality, without any lawful justification.

317.   Plaintiffs have a constitutionally protected liberty interest in making personal choices regarding family matters in a manner that is free from unjustifiable government interference in said choices.

318.   Defendants' improper denial of immigrant visas despite the fact that Plaintiffs qualify for waivers under the Proclamation constitutes a de facto deprivation of Plaintiffs constitutionally protected liberty interests under the Fifth Amendment of the United States Constitution.

319.   Defendants' violations of these laws have harmed and continue to harm Plaintiffs by exposing them to economic loss and indefinitely denying them access to their families and adequate medical care.

## COUNT FOUR
## Fifth Amendment Substantive Due Process Violation
## (Against All Defendants)

320.     Plaintiffs re-allege and incorporate by reference the statements above as if set forth fully herein.

321.     Plaintiffs have a constitutionally protected liberty interest in making personal choices regarding family matters in a manner that is free from unjustifiable government interference in said choices. *See, e.g., Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) (reaffirming substantive due process rights that protect recognized liberty interests—such as life choices concerning family relationships and childrearing, and decisions concerning marriage—against government deprivation).

322.     Plaintiffs' fundamental rights include their right to the "integrity of the family unit." *Stanley v. Illinois,* 405 U.S. 645, 651 (1972).

323.     The implementation of the waiver provision under the Proclamation directly and substantially infringes on Plaintiffs' fundamental rights.

324.      The Due Process Clause forbids Defendants from infringing on Plaintiffs' fundamental rights unless the infringement is narrowly tailored to serve a compelling governmental interest.

325.     As applied, the Proclamation's waivers provision fails this test. It is not narrowly tailored and it operates to block nearly all persons from banned countries from entry into the United States, regardless of whether they meet the criteria for a waiver grant.

326.     Defendants' decisions, actions and/or inaction relating to unlawful and improper decisions regarding Plaintiffs' visa applications have deprived Plaintiffs of their liberty interest in making

personal choices regarding family matters in a manner that is free from unjustifiable government interference in said choices.

327.    As a result of Defendants' actions and/or inactions regarding the waiver under the Proclamation, Plaintiffs have been separated from their families for years, causing extreme financial and emotional hardship and stress.

328.    Defendants have deprived Plaintiffs of the above-described fundamental liberty interest without first supplying a legitimate governmental interest as a reason for taking the herein-alleged actions and/or failure to act.

329.    Defendants' actions and/or inaction in arbitrarily depriving Plaintiffs of the liberty interest described herein violate their Substantive Due Process rights under the Fifth Amendment.

330.    Defendants' violations of these laws have harmed and continue to harm Plaintiffs by exposing them to economic loss and indefinitely denying them access to their families and adequate medical care.


**COUNT FIVE**
**Ninth Amendment Violation**
**(Against all Defendants)**

331.    Plaintiffs re-allege and incorporate by reference the statements above as if set forth fully herein.

332.    Plaintiffs have a constitutionally protected right to have their visa applications adjudicated in a timely manner and in accordance with due process under the Fifth and Ninth Amendments to the U.S. Constitution.  Plaintiffs further have a constitutionally protected right in making personal choices regarding family matters under the Fifth and Ninth Amendments to the U.S. Constitution, and they further have a right against non-discrimination by a state agency.  The Supreme Court

has established that the due process principle in the Constitution applies to "all persons" which includes noncitizens. *See, e.g., U.S. v. Wong Kim Ark*, 169 U.S. 649 (1898) (holding that the term "person" under the Fifth Amendment applied to aliens living in the U.S.); *see also, e.g., Graham v. Richardson*, 403 U.S. 365, 376 (1971) (invalidating state laws conditioning receipt of welfare benefits on possession of U.S. citizenship or durational residence within the United States).

333.    Although the Equal Protection Clause of the Fourteenth Amendment applies only to state and local governments, the Supreme Court has held that the Due Process Clause of the Fifth Amendment imposes various equal protection requirements on the federal government. *Bolling v. Sharpe,* 347 U.S. 497 (1954).

334.    Further, the Ninth Amendment of the U.S. Constitution states "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Defendants' policies and procedures including the fraudulent waiver process under the Proclamation and their failure to provide meaningful guidance for how to qualify and apply for a waiver systematically violates Plaintiffs' implied fundamental rights under the Fifth and Ninth Amendments to the Constitution.

335.    Defendants' violations of these have harmed and continue to harm Plaintiffs by exposing them to economic loss and indefinitely denying them access to their families and adequate medical care.

**COUNT SIX**
**Violation of Substantive and Procedural Due Process under the Fifth Amendment**
(***Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics***)
(**As to Defendants Miller, Whitaker, Pompeo, Nielsen, Cissna, McAleenan, Coats, Kennington, and Godbey**)

336.    Plaintiffs re-allege and incorporate by reference the statements above as if set forth fully herein.

337.    Plaintiffs have a constitutional right to clear information and guidance from Defendants regarding what qualifies for a waiver under the Proclamation and to have their immigrant visa applications adjudicated within a reasonable amount of time under the Fifth Amendment to the United States Constitution.

338.    Defendant Miller played a significant role in the drafting of the Proclamation.  He has also been a staunch advocate of restricting entry and migration of Muslims in the United States.  He often uses psychological tactics to deter immigration such as leading meetings with horror stories of Americans being victimized by noncitizens in order to push his anti-immigrant and anti-Muslim agenda.  (See Exhibit S, Nahal Toosi, "Inside Stephen Miller's Hostile Takeover of Immigration Policy").

339.    Defendants Whitaker, Pompeo, Nielsen, Cissna, McAleenan, and Coats are all responsible for the implementation and enforcement of the Proclamation, a blatantly racist and discriminatory policy, which targets immigrants from Muslim countries and is essentially a Muslim ban.  In addition, they have repeatedly failed to provide meaningful guidance on the waiver process thereby discriminating against people from Muslim majority countries by prohibiting them from obtaining immigrant visas although they qualify for waivers.

340.    By failing to provide meaningful guidance for how to qualify for a waiver under the Proclamation, Defendants Miller, Whitaker, Pompeo, Nielsen, Cissna, McAleenan, and Coats have departed from statutory procedure and deprived Plaintiffs of their statutory and constitutionally protected rights under the Fifth Amendment to the United States Constitution.  *See* Proclamation § 3(c) (instructing "[t]he Secretary of State and the Secretary of Homeland Security shall coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants").

341.    Defendant Nielsen has lied about the Trump Administration's family separation and anti-immigrant policies as detailed above in her tweet stating: "We do not have a policy of separating families at the border.  Period."  (See Exhibit U, Tweet by Department of Homeland Security Secretary Kirstjen Nielsen).  This statement directly contradicts Defendants' anti-immigrant policy and intentions of separating families at the border as exhibited in a recently released draft report detailing Defendants' plan to separate children from their families and deport them without asylum hearings.  (See Exhibit T, Draft Memo Titled "Policy Options to Respond to Border Surge of Illegal Immigration").

342.    Defendants Miller, Whitaker, Pompeo, Nielsen, Cissna, McAleenan, and Coats are purposely depriving Plaintiffs of their constitutional rights in order to further their agenda to keep Muslims out of the United States.

343.    Defendants Kennington and Godbey are purposely, maliciously, and unlawfully depriving Plaintiffs of their statutory and constitutional rights by issuing blanket denials of waivers to Plaintiff-Beneficiaries and their families who all qualify for waivers under the Proclamation and refusing to answer their questions about what qualifies for a waiver.  *See* 9 FAM 5 04.13 (f) ("If the consular officer refuses the visa, he or she must inform the applicant of the provisions of law on which the refusal is based, and of any statutory provision under which administrative relief is available").  In addition, as discussed above, Defendants Kennington and Godbey are refusing to issue waivers and/or offer guidance on the waiver process even when Plaintiffs provide evidence proving they qualify for waivers under the Proclamation, thereby denying Plaintiffs of their right to Due Process under the Fifth Amendment of the United States Constitution.  (See Exhibits DD1-DD3).

344.    Defendants Miller, Whitaker, Pompeo, Nielsen, Cissna, McAleenan, Coats, Kennington, and Godbey acted under color of law and acted or purported to act in the performance of official duties under the law, as federal agents.

345.    Defendants Miller, Whitaker, Pompeo, Nielsen, Cissna, McAleenan, and Coats' conduct proximately caused harm to Plaintiffs because their actions and inactions in implementing and enforcing the Proclamation as well as their lack of clear guidance on the waiver process has denied Plaintiffs the opportunity to receive immigrant visas although they all qualify due to extreme hardship.  As a result of Defendants' unreasonable denials and delays in the adjudication of their immigrant visas, Plaintiffs have been separated from their families and loved ones for years, suffered extreme financial hardship, and been prohibited them from receiving timely and adequate medical care for life threatening medical conditions.

346.    Defendants Kennington and Godbey's conduct proximately caused harm to Plaintiffs because their actions and inactions in denying waivers under the Proclamation as well as their lack of clear guidance on the waiver process and refusal to accept Plaintiffs' documents has denied Plaintiffs the opportunity to receive immigrant visas although they all qualify due to extreme hardship.  As a result of Defendants' unreasonable denials and delays in the adjudication of their immigrant visas, Plaintiffs have been separated from their families and loved ones for years, suffered extreme financial hardship, and been prohibited them from receiving timely and adequate medical care for life threatening medical conditions.

347.    Defendants Miller, Whitaker, Pompeo, Nielsen, Cissna, McAleenan, Coats, Kennington, and Godbey's conduct was done intentionally, with deliberate indifference, or, at a minimum, with reckless disregard of Plaintiffs' constitutional rights.

348.    Defendants Miller, Whitaker, Pompeo, Nielsen, Cissna, McAleenan, Coats, Kennington, and Godbey's conduct was unreasonable, arbitrary, and capricious.

349.    There is no statutory cause of action or alternate remedial relief available that addresses this misconduct either directly under the Constitution, or under any administrative processes emanating therefrom.

350.    Defendants Miller Whitaker, Pompeo, Nielsen, Cissna, McAleenan, and Coats can claim no immunity as they are ethically bound by their position to act in accordance with applicable law while in their positions working for the government of the United States of America.

351.    Defendants Kennington and Godbey can claim no immunity as they are ethically bound by their position to act in accordance with applicable law while at their posts at U.S. Embassies abroad on what have definitively been deemed U.S. soil.

352.    This cause of action for the violation of Plaintiffs' Fifth Amendment rights is brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## COUNT SEVEN
## Writ of Mandamus
## (As to all Defendants)

353.    Plaintiffs re-allege and incorporate by reference the statements above as if set forth fully herein.

354.    Defendants have a non-discretionary duty to develop guidance on the waiver process and to receive and fully and fairly adjudicate applicants' requests for waivers under the Proclamation. These non-discretionary duties arise under section 3 of the Proclamation and under the INA and its implementing regulations.

355.    The APA requires agencies to "proceed to conclude a matter presented" to the agency "within a reasonable time." 5 U.S.C. § 555(b).

356.    Defendants are unlawfully failing to accept waiver applications and to consider Plaintiffs' requests for waivers under the Proclamation and are thus failing to carry out the adjudicative and administrative functions delegated to them by law with regard to Plaintiffs' cases.

357.    Defendants' refusal to receive and fully consider applicants' eligibility for waivers on a case-by-case basis and to develop meaningful guidance is arbitrary, capricious, and not in accordance with the law.

358.    Defendants' issuance of blanket denials to visa applicants from banned countries without consideration of their individual circumstances violates Plaintiffs' Fifth Amendment rights to substantive and procedural due process and to equal protection under the law.

359.    Because there are no other adequate remedies available to Plaintiffs, mandamus is appropriate. *See* 5 U.S.C. § 704.

360.    Defendants' violations of these laws have harmed and continue to harm Plaintiffs by exposing them to economic loss and indefinitely denying them access to their families and adequate medical care.


**COUNT EIGHT**
**Declaratory Judgment Act**
**(As to all Defendants)**

361.    Plaintiffs re-allege and incorporate by reference the statements above as if set forth fully herein.

362.    Plaintiffs contend that Defendants' actions and decisions relating to the waiver under the Proclamation violate federal regulations and Plaintiffs' due process rights including the FAM,

INA, APA, federal regulations, and Plaintiffs' constitutionally protected rights under the Fifth Amendment.

363.    Plaintiffs seek a declaration to that effect under 28 U.S.C. § 2201 as the Defendants have severally and jointly violated federal regulations and Plaintiffs' due process rights.

364.    As a result, Plaintiffs have suffered and continue to suffer irreparable harm and damage entitling them to declaratory, injunctive and other relief.

### COUNT NINE
### (Equal Access to Justice Act)
### (5 U.S.C. § 504; 28 U.S.C. §2412)
### (As to All Defendants)

365.    Plaintiffs re-allege and incorporate by reference the statements above as if set forth fully herein.

366.    If Plaintiffs prevail, they will seek costs under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request the Court to grant the following relief:

(1) Plaintiffs seek relief ordering the following:

(2) Issue a declaratory judgment directing Defendants to adjudicate Plaintiffs' applications for waivers pursuant to Section 3(c) of the Proclamation, and issue a final determination on Plaintiffs' applications for immigrant visas within 15 days;

(3) Declare that Defendants' actions and inactions including the lack of clarity surrounding the adjudication of waivers pursuant to Section 3(c) of the Proclamation and the delay in adjudicating Plaintiffs' visa applications is unreasonable and violates the APA, the INA,

and the Fifth and Ninth Amendments to the U.S. Constitution and that Plaintiffs are entitled to a prompt adjudication of their waiver and visa applications within 15 days;

(4)  Instruct that DHS set up a specific guideline and application process for the waiver with a set adjudication time;

(5)  Find that the waiver process is unconstitutional and that because the Supreme Court relied on this process and that false information given by the Attorney General, and as a result strike down the Proclamation in its entirety;

(6)  Enjoin the U.S. Embassy in Djibouti from denying immigrant visas for those who qualify for the waiver under the Proclamation;

(7)  Issue a declaratory judgment ordering the removal of Chapman Godbey from any post where he serves as a consular officer;

(8)  If Plaintiffs prevail, they will seek attorney's fees and costs pursuant to 42 U.S.C. § 1988 and under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412. Accordingly, award Plaintiffs' costs and reasonable attorney's fees; including but not limited to, costs and reasonable attorney's fees available under EAJA and 42 U.S.C. § 1988.

(9)  Grant any other relief as the Court may deem just and proper.


Dated: Bronx, NY
February 11, 2019                         Respectfully submitted,


                                          __/s/ Julie Goldberg_____
                                          Julie Goldberg, Esq.
                                          Mehgan Gallagher, Esq.
                                          Goldberg and Associates P.C.
                                          5586 Broadway, Third Floor
                                          Bronx, New York 101463
                                          Tel: (718) 432-1022

E-mail: uscis@goldbergimmigration.com
*Attorney for the Plaintiffs*